787 F.2d 117
 24 ERC 1128, 16 Envtl. L. Rep. 20,467
 TOWNSHIP OF FRANKLIN SEWERAGE AUTHORITY
v.
MIDDLESEX COUNTY UTILITIES AUTHORITY
v.
The STATE OF NEW JERSEY, By and Through ITS DEPARTMENT OF
ENVIRONMENTAL PROTECTION, the United States of America, By
and Through its United States Environmental Protection
Agency, the Township of Woodbridge, a municipal corporation
of the State of New Jersey, the City of Perth Amboy, a
municipal corporation of the State of New Jersey, the
Borough of Carteret, a municipal corporation of the State of
New Jersey.
Appeal of The TOWNSHIP OF WOODBRIDGE.
 No. 85-5493.
 United States Court of Appeals,
Third Circuit.
 Argued March 4, 1986.
Decided March 28, 1986.
 
 F. Henry Habicht, II, Asst. Atty. Gen., Dirk D. Snel, Bruce J. Berger, John T. Stahr (argued), Attys., Dept. of Justice, Washington, D.C., for U.S.; George A. Shanahan, U.S., E.P.A.--Region II, New York City, of counsel.
 Joseph R. Bulman (argued), on brief, (Arthur W. Burgess, Director of Law, of counsel), Woodbridge, N.J., for Woodbridge Tp.
 Before GIBBONS, BECKER and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 The Township of Woodbridge appeals from an interlocutory order entered by the district court denying its motion to dissolve an injunction and granting the United States' motion for the assessment of civil sanctions. Woodbridge argues that the district court should have granted its motion to dissolve the injunction because it was not in violation of any federal law. The government contends that we should dismiss the appeal for lack of jurisdiction, and, alternatively, that the district court's refusal to dissolve the injunction was proper because Woodbridge violated sections 301(a) and 301(b)(1)(B) of the Clean Water Act, 33 U.S.C. Sec. 1311(a) and (b)(1)(B) (1982). We affirm.
 
 I.
 
 2
 This appeal arises out of a cross-claim filed by the United States in a suit originally brought by the Township of Franklin Sewerage Authority against the Middlesex County Utilities Authority (MCUA), a regional waste treatment facility and sewage disposal system. Franklin delivers its sewage to MCUA and is charged on a pro rata basis. It sued MCUA to compel three other municipalities, Woodbridge, the Borough of Carteret and the City of Perth Amboy, to link their sewage systems with MCUA and to share in the cost of MCUA's operations. MCUA, in turn, filed a third-party complaint against Woodbridge, Carteret, Perth Amboy, the New Jersey Department of Environmental Protection (NJDEP), and the United States, through the United States Environmental Protection Agency (EPA). The United States then filed cross-claims against Woodbridge, Carteret, and Perth Amboy, seeking to enjoin those parties from discharging pollutants into navigable waters in violation of sections 301(a) and 301(b)(1)(B) of the Clean Water Act. The United States also sought an order compelling them to link their sewage systems to the MCUA system pursuant to section 208 of the Clean Water Act, 33 U.S.C. Sec. 1288 (1982), prescribing the development of areawide waste treatment management systems. The liability of both Carteret and Perth Amboy was resolved in favor of the United States upon the district court's entry of summary judgment against Carteret and its entry of a consent judgment against Perth Amboy. Both judgments required the municipalities to tie in with MCUA. This appeal involves Woodbridge's liability on the United States' cross-claim.
 
 
 3
 Woodbridge owns and operates two wastewater treatment works, the Keasbey Sewage Treatment Plant (Keasbey) and the Sewaren Sewage Treatment Plant (Sewaren). Both consist of a primary treatment plant and a wastewater collection system. The collection systems channel sewage, industrial waste, and storm runoff into the primary plants for treatment. After treatment is completed, Keasbey discharges into Kinsey Creek and Sewaren discharges into Arthur Kill, both navigable waters.
 
 
 4
 In 1975, the Governor of New Jersey, pursuant to section 208 of the Clean Water Act, appointed a board consisting of numerous public officials to develop a regional wastewater treatment plan for Middlesex County. The plan was completed in 1977, was certified by the Governor in 1978, and was approved by the EPA in 1979. The plan calls for the abandonment of existing municipal treatment facilities and the channeling of their sewage flows to MCUA.
 
 
 5
 In 1977, EPA issued Woodbridge National Pollutant Discharge Elimination System (NPDES) permits for Keasbey and Sewaren, allowing Woodbridge to continue utilizing these two facilities even though the quality of their discharges did not satisfy the effluent standards set by the Clean Water Act. See 33 U.S.C. Sec. 1311(b)(1)(B). These permits were effective from December 31, 1977 until December 31, 1981. The permits, however, required Woodbridge to tie in with MCUA as soon as the construction of the transmittal facilities was completed. In 1978, Woodbridge obtained modifications of its NPDES permits. The modifications essentially granted Woodbridge an extension of time in which to use the Keasbey and Sewaren plants and in which to tie in to MCUA, provided that Woodbridge complied with a planning schedule developed by EPA for transporting sewage flows to MCUA.
 
 
 6
 In 1977 EPA awarded Woodbridge a planning grant of nearly $1,000,000 to develop the transmittal facilities. In 1980, EPA awarded Woodbridge a $1,600,000 design grant for the MCUA tie-in. In 1984, EPA awarded Woodbridge a $5,500,000 construction grant for the Keasbey tie-in segment.
 
 
 7
 On March 9, 1984 the United States filed a motion for summary judgment on liability on its cross-claim against Woodbridge. Following briefing and oral argument, the district court denied the United States' motion, finding that it was possible that as a matter of law Woodbridge, through its Keasbey and Sewaren plants, was discharging sewage pursuant to valid NPDES permits.
 
 
 8
 The United States moved for reconsideration, stating that it did not contest the validity of the permits. Rather, it contended that Woodbridge's actions were in violation of the terms of otherwise valid permits. On October 24, 1984, the court granted the United States' motion for reconsideration and entered partial summary judgment in its favor, holding that Woodbridge was violating section 301 of the Clean Water Act by discharging pollutants into navigable waters, by failing to provide adequate secondary treatment at its two sewage plants to meet the requisite effluent limitations, and by failing to tie into the MCUA regional treatment facility. The court ordered the parties to submit to it within forty-five days plans for bringing Woodbridge in compliance with the Act.
 
 
 9
 On November 21, 1984, Woodbridge appealed the entry of partial summary judgment. The United States moved to dismiss the appeal for lack of jurisdiction. On February 12, 1985, we dismissed Woodbridge's interlocutory appeal without prejudice.
 
 
 10
 In the interim, on December 11, 1984, the United States filed a motion with the district court to compel Woodbridge to comply with the Clean Water Act and to tie in with MCUA. On December 18, 1984, the district court entered an injunction directing Woodbridge to develop a compliance schedule within sixty days and to achieve actual compliance within a specified time. In addition, the order provided that civil penalties would be assessed against Woodbridge if it failed to comply. This order was not appealed. Instead, Woodbridge requested the district court to certify for appeal pursuant to 28 U.S.C. Sec. 1292(b)(1982), the court's October 24, 1984 order granting partial summary judgment in favor of the United States, and to stay the proceedings pending appeal. The district court granted Woodbridge's motion for certification, but denied its motion for a stay. This court on April 12, 1985 denied Woodbridge's petition for leave to appeal.
 
 
 11
 On April 15, 1985, the United States filed a motion for a judgment that Woodbridge had failed to comply with the terms of the injunction and for the imposition of sanctions for its failure to comply. On May 6, 1985, almost five months after the district court entered the injunction, Woodbridge moved for the district court to dissolve it. The district court denied Woodbridge's motion, but granted the United States' motion for sanctions, assessing $16,800.00 in penalties against Woodbridge. The court also directed Woodbridge to submit a compliance schedule within a specified time.
 
 
 12
 In rejecting the arguments raised in Woodbridge's motion to dissolve the injunction, the court stated that it already had addressed and rejected the same arguments on two prior occasions, first when it entered summary judgment against Woodbridge, and second when it entered the December injunction against Woodbridge. Because Woodbridge failed to offer any new authority or analysis supporting a contrary result, the court held that Woodbridge's motion was without merit.
 
 
 13
 The compliance schedule was finally filed on July 22, 1985. It met with the acceptance of both the NJDEP and the EPA. Woodbridge then filed this appeal and sought a stay of the remainder of the district court's order in this court. We denied the stay on August 15, 1985.
 
 II.
 
 14
 The primary issue before us is what issues may be raised in an appeal from the denial of a motion to dissolve an injunction. The United States contends that unless the appellant alleges that changed circumstances warrant overturning the injunction, the court of appeals lacks jurisdiction. Because the denial of a motion to dissolve an injunction comes within the language of section 1292(a)(1) of title 28 of the United States Code, which explicitly confers jurisdiction over such interlocutory orders, the United States' position is without merit. See 28 U.S.C. Sec. 1292(a)(1) (1982). There can be no question that this court has jurisdiction over Woodbridge's interlocutory appeal. See Professional Plan Examiners, v. LeFante, 750 F.2d 282, 287 (3d Cir.1984); International Brotherhood of Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Association, 660 F.2d 76, 80-81 (3d Cir.1981); Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc., 579 F.2d 786, 791 (3d Cir.1978).
 
 
 15
 The crucial question thus is not appellate jurisdiction, but scope of review. The prevailing law is that appellate review of an order denying a motion to dissolve an injunction is confined to the propriety of the denial of the motion; it does not extend to the propriety of the entry of the underlying injunction. See, Merrell-National, 579 F.2d at 791. Accord LeFante, 750 F.2d at 287; Winterland Concessions Co. v. Trela, 735 F.2d 257, 260 (7th Cir.1984); Cerro Metal Products v. Marshall, 620 F.2d 964, 972 n.18 (3d Cir. 1980). See generally 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3924 (1977 & Supp.1985). The rationale behind this rule is that the appellant should not be allowed "to use the appealability of an order denying modification [or dissolution] of an injunction to circumvent the time bar to appeal from the underlying injunction." Merrell-National, 579 F.2d at 791.
 
 
 16
 Since our review is limited to considering the correctness of the district court's denial of the motion to dissolve the injunction, we can reverse the decision of the district court only if we find that the district court has abused its discretion. See Merrell-National, 579 F.2d at 791-92. The standard that the district court must apply when considering a motion to dissolve an injunction is whether the movant has made a showing that changed circumstances warrant the discontinuation of the order. See LeFante, 750 F.2d at 287; Merrell-National, 579 F.2d at 791.
 
 
 17
 In this case, Woodbridge failed to adduce any evidence of changed circumstances that would warrant the dissolution of the December injunction. Before the district court, Woodbridge argued that its liability under the Clean Water Act was contingent upon its receipt of federal funds, and that the 1981 amendments to the Act extended the grace period for noncompliance until 1988. Reviewing these contentions, the district court found that Woodbridge was simply repeating arguments that it had raised on one if not two prior occasions and that had been explicitly rejected by the district court on each occasion. Therefore, the district court concluded that "Woodbridge's motion [was] without merit and border[ed] on the abusive." Joint Appendix at 666.
 
 
 18
 The district court correctly applied the changed circumstances standard. From the record it appears that Woodbridge clearly had raised the funding argument and the amendment argument before, and that each time they were resoundingly rejected by the district court. Woodbridge could have presented these arguments to us on an appeal from the district court's entry of the December injunction. Woodbridge, however, neglected to take an appeal from that order. Now that the time for appeal has run, Woodbridge may not avoid the consequences of its failure to appeal timely by cloaking its late appeal in the guise of a motion to dissolve the injunction. Absent the assertion of changed circumstances, the appellant is not entitled to the vacation of an unappealed injunction. Because Woodbridge did not assert any changed circumstances, the district court did not abuse its discretion in denying its motion to dissolve the December injunction.
 
 III.
 
 19
 Because our scope of review is limited to determining whether the district court abused its discretion in denying Woodbridge's motion to dissolve the December injunction, we cannot reach the issue of the correctness of the district court's entry of the December injunction. Assuming, arguendo, however, that we were to reach this issue, we nonetheless would affirm the district court.
 
 
 20
 Woodbridge contests the propriety of the entry of the December injunction, arguing that its failure to tie in to the MCUA system is not a violation of section 301 of the Clean Water Act because subsection (i) of that section provides that a municipality's obligations are contingent upon its receipt of federal financial assistance. In the alternative, Woodbridge claims that the entry of the injunction was improper because it is discharging pollutants pursuant to valid NPDES permits.
 
 
 21
 The language and legislative history of section 301(i) of the Clean Water Act require the inescapable conclusion that a municipality's obligation under that section is not contingent upon its receipt of federal financial assistance. Section 301(i) states that
 
 
 22
 [w]here construction is required in order for a planned or existing publicly owned treatment works to achieve limitations under ... [certain subsections of] this section, but (A) construction cannot be completed within the time required in such subsection, or (B) the United States has failed to make financial assistance under this chapter available in time to achieve such limitations by the time specified in such subsection, the owner or operator of such treatment works may request the Administrator ... to issue a permit pursuant to section 1342 of this title or to modify a permit issued pursuant to that section to extend such time for compliance.
 
 
 23
 33 U.S.C. Sec. 1311(i)(1)(1982).
 
 
 24
 In this section, Congress made clear that the existence of either of the two specified conditions only activates the Administrator's discretion to award or to modify a permit. See Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.L. No. 97-117, Sec. 21(a), 95 Stat. 1623, 1631. Nowhere did Congress provide that the existence of either of these conditions automatically suspends or requires the Administrator to suspend an operator's obligations under the Act. Moreover, even if these conditions exist and the Administrator has the discretion to grant a permit or modification, the owner or operator must still ask for one. See 33 U.S.C. Sec. 1311(i). Thus, from the plain language of the statute it is clear that the obligation of an operator such as Woodbridge to comply with the Clean Water Act is not conditioned upon the operator's receipt of federal funds. This reading accords with that of the other courts that have considered the same issue. See United States v. City of Detroit, 720 F.2d 443, 451 (6th Cir.1983); State Water Control Board v. Train, 559 F.2d 921, 924-27 (4th Cir.1977). Thus if the question were properly before us, we would hold that funding is not a prerequisite to compliance with the Act.
 
 
 25
 Woodbridge's second argument is that it is not in violation of the Act because it is discharging pollutants pursuant to valid NPDES permits. The controversy over the validity of the permits centers around their date of expiration. The United States asserts that the language of the Clean Water Act and the permits themselves provide that they expired on July 1, 1983. Woodbridge contends that by operation of the 1981 amendments to the Clean Water Act, the permits, which were originally to expire on July 1, 1983, were automatically extended to July 1, 1988.
 
 
 26
 Section 301(a) of the Act provides that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. Sec. 1311(a). Section 301(b)(1)(B) of the Act, which was first enacted in 1972 as part of the Federal Water Pollution Control Act Amendments of 1972 (FWPCAA), Pub.L. No. 92-500, Sec. 301(b)(1)(B), 86 Stat. 816, requires publicly owned treatment works to achieve compliance with certain effluent limitations by July 1, 1977. 33 U.S.C. Sec. 1311(b)(1)(B). Section 402 of the Act, which also was enacted as part of the FWPCAA, provides, however, that public treatment works can apply for NPDES permits to allow them to continue discharging pollutants so long as they comply with the conditions imposed by the EPA Administrator to achieve compliance sometime in the future. 33 U.S.C. Sec. 1342 (1982). Under section 208 of the Act, permits issued under section 402 cannot conflict with the requirements of any regional wastewater treatment plan. 33 U.S.C. Sec. 1288(e) (1982).
 
 
 27
 In October of 1977, the regional plan encompassing Woodbridge was complete. On November 15, 1977, Woodbridge applied for two NPDES permits. As a condition for obtaining the permits, the EPA Administrator required Woodbridge to convey its sewage flows to MCUA as soon as the transmittal facilities were operable. Joint Appendix at 685, 702. These permits, by their own terms, were due to expire on December 31, 1981.
 
 
 28
 On December 27, 1977, Congress amended the FWPCAA by enacting the Clean Water Act of 1977, Pub.L. No. 95-217, 91 Stat. 1566. Although retaining the requirement in section 301(b)(1)(B) that publicly owned treatment works comply with certain effluent limitations, Congress added subsection (i), entitled, "Municipal Time Extensions," which allows the owners of such works to apply for NPDES permits or modifications of their existing NPDES permits to enable them to discharge pollutants beyond the July 1, 1977 deadline. See Pub.L. No. 95-217, Sec. 45, 91 Stat. at 1584-85 (codified at 33 U.S.C. Sec. 1311(i) (1982)). The statute provides, however, that in no event can extensions be granted beyond July 1, 1983. Id.
 
 
 29
 To obtain an NPDES permit or a modification of an NPDES permit under the statute, the owner must show that it cannot meet the compliance standards because the necessary construction can not be completed in time, or the necessary federal funding has not been made available and that it has been acting in good faith. See id.; S.Rep. No. 95-370, 95th Cong., 1st Sess. 46-50, reprinted in 1977 U.S.Code Cong. & Ad.News 4326, 4371-4375. In addition, the statute provides that requests for either a permit or a modification must be filed with the Administrator within 180 days of December 27, 1977. 33 U.S.C. Sec. 1311(i).
 
 
 30
 After discovering that it was not meeting the effluent limitations imposed by the Act, Woodbridge, presumably within the 180-day period specified in section 301(i), applied for a modification of its November 1977 NPDES permits. The modification was granted on November 29, 1978. The modification gave Woodbridge an extension until July 1, 1983. The permits reiterated the requirement that Woodbridge tie in with MCUA, and they set forth a compliance schedule to encourage Woodbridge to take certain steps towards this end within specified time periods. The outside date for completion under the terms of both the permits and the statute remained July 1, 1983.
 
 
 31
 On December 29, 1981 Congress amended the Clean Water Act, primarily to eliminate federal funding for certain categories of waste treatment facilities. See Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.L. No. 97-117, 95 Stat. 1623, 1631. In addition, however, section 21(a) of the Amendments changed the ultimate deadline for compliance in section 301(i) of the Act from July 1, 1983 to July 1, 1988. The rest of section 301(i) remained unchanged, including the requirement that any requests for NPDES permits or for extensions of such permits be filed within 180 days of December 27, 1977.
 
 
 32
 In enacting section 21(a) Congress explained that the amendment extending the deadline to July 1, 1988 was not to be construed
 
 
 33
 to extend the date of compliance ... [with the effluent limitations] beyond schedules for compliance in effect as of the date of the enactment of this Act, except in cases where reductions in the amount of financial assistance under this Act or changed conditions affecting the rate of construction beyond the control of the owner or operator will make it impossible to complete construction by July 1, 1983.
 
 
 34
 Id. The legislative history of the Municipal Wastewater Treatment Construction Grant Amendments of 1981 provides no further explanation of the meaning or the effect of the amendment establishing the new July 1, 1988 deadline.
 
 
 35
 Woodbridge contends that the enactment of section 21(a) automatically extended its permits to July 1, 1988 because its compliance was held up by the federal government's failure to allocate sufficient funds for the linkage project. Examining the language of section 21(a), however, it appears that it sanctions extensions only for two categories of municipal works--those whose funding was reduced pursuant to the 1981 amendments, and those for whom changed conditions beyond their control have made compliance impossible. Nothing in the record establishes that Woodbridge satisfies either of these conditions. Therefore, we reject Woodbridge's contention that the 1981 amendments extended its permits until July 1, 1988.
 
 
 36
 Because Woodbridge continued to discharge pollutants beyond the July 1, 1983 expiration date of its permits, we would, if its appeal were timely, hold that Woodbridge violated section 301 of the Clean Water Act, and that the district court's entry of the injunction was, therefore, proper.
 
 IV.
 
 37
 The order denying Woodbridge's motion to dissolve the December 18, 1984 injunction will be affirmed. Because Woodbridge made no showing of changed circumstances, its motion was completely without merit, and this appeal is frivolous. The United States shall be awarded double costs. Fed.R.App.P. 38.