PORTER COUNTY CHAPTER OF the IZAAK WALTON LEAGUE OF AMERICA, INC., Save the Dunes Council, Inc., Ann Sims and Herbert P. Read, Petitioners,

v.

Douglas COSTLE, Administrator, United States Environmental Protection Agency, Respondent,

Northern Indiana Public Service Company, Intervenor.

Nos. 76–2098 and 77–1262.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1977.

Decided Jan. 30, 1978.

Rehearing Denied March 20, 1978.

Marvin N. Benn, Edward W. Osann, Jr., Chicago, Ill., for petitioners.

William H. Eichhorn, Hammond, Ind., William T. Hart, Chicago, Ill., for intervenor.

Alfred T. Ghiorzi, Lloyd S. Guerci, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, COWEN,* Senior Judge, and CUMMINGS, Circuit Judge.

* Senior Judge Wilson Cowen of the United States Court of Claims is sitting by designation.

1. Act of October 27, 1965, title III, § 301, 79 Stat. 1073.

2. 86 Stat. 816 (codified at 33 U.S.C. §§ 1251 *et seq.* (Supp. V 1975)).

3. 33 U.S.C. § 1342 (Supp. V 1975). Section 1342(a)(1) provides:

"Except as provided in sections 1328 and 1344 of this title, the Administrator [of EPA] may, after opportunity for public hearing,

COWEN, Senior Judge.

This case involves the interpretation of Public Law 89–298 [1] as it applies to the control of pollutants from the Northern Indiana Public Service Company (NIPSCO) generating plant into Lake Michigan at Burns Waterway Harbor adjacent to the Indiana Dunes National Lakeshore. The question is whether the Environmental Protection Agency's (EPA) grant of a seemingly lawful discharge permit to NIPSCO under section 402 of the Federal Water Pollution Control Act of 1972, as amended, (FWPCA) [2] was nonetheless unlawful, because EPA ignored a higher standard established for pollution control in the vicinity of Burns Harbor under Public Law 89–298. Petitioners, the Izaak Walton League, et al., (League) contend that they have properly exhausted their administrative remedies before EPA; that this court has jurisdiction over this action, and that the EPA Administrator's decision interpreting Public Law 89–298, should be reversed. We hold that the action is properly before this court, but that the legislative history and a fair interpretation of this statute warrant affirmance of the Administrator's decision on the merits.

*Background*

On October 31, 1974, the Director of the Enforcement Division of Region V of EPA, pursuant to section 402 of the FWPCA,[3] issued a National Pollutant Discharge Elimination System (NPDES) permit to NIPSCO for its coal-fired Bailly generating station adjacent to Burns Harbor. This permit required NIPSCO to heed certain effluent

issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) [which makes pollution unlawful except as in compliance with law] of this title, upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter."

limitations[4] and other special conditions. On November 14, 1974, NIPSCO requested an adjudicatory hearing[5] to resolve questions on the permit. EPA granted this request and gave public notice of the hearing on June 27, 1975. In response to this notice, the petitioners filed a request for party status on July 28, 1975. EPA granted this request on August 29, 1975.

As a result of a prehearing conference held on November 12, 1975, the presiding officer certified to the General Counsel of EPA for decision what has become the major issue in this litigation. Petitioners contended that Public Law 89–298 should have been applied by EPA's Regional Director of Enforcement in issuing NIPSCO a permit to discharge pollutants into Burns Harbor under the FWPCA. Specifically, the petitioners contended the following provision in Public Law 89–298 mandates a higher standard than does section 402 of the FWPCA and that EPA should have followed this higher standard in issuing the permit to NIPSCO.

> [Prior to the construction of the Harbor project the] State of Indiana shall furnish assurance satisfactory to the Secretary of the Army that water and air pollution sources will be controlled to the *maximum extent feasible* in order to minimize any adverse effects on public recreational areas in the general vicinity of [Burns] Harbor (emphasis added).[6]

On June 9, 1976, the General Counsel of EPA decided:

Congress clearly left the determination of the scope of such assurance [about control of pollution near Burns Harbor] to the discretion of the Secretary of the Army.
\* \* \*

\* \* \* The Act on its face does not impose any obligations on parties other than those named in it. [EPA was not named]. In the absence of compelling legislative history to the contrary, I conclude that Public Law 89–298 has no applicability in establishing effluent limitations for the NPDAS permit at issue.[7]

On July 6, 1976, the petitioners filed a petition to the Administrator for review of this decision. He first considered the "ripeness" of the petition for review and decided that, since the decision of the General Counsel would "undergo no further refinements" prior to the decision of the Regional Administrator about the NPDES permit, he would exercise his "inherent discretion to entertain the instant Petition."[8] He then denied the petition on the merits on August 10, 1976.

On October 7, 1976, the Regional Administrator issued the initial decision authorizing the issuance of an amended NPDES permit to NIPSCO. At this time the parties entered into a stipulation which resolved factual issues and preserved legal questions pertaining to Public Law 89–298. When the petitioners did not seek any further review with the Administrator within 10 days, the initial decision of the Regional Administrator on the permit became the final decision of the Agency.[9]

---

4. The Federal Water Pollution Control Act, § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A) (Supp. V 1975), provides:

> "In order to carry out the objective of this chapter there shall be achieved—
> "(1)(A) not later than July 1, 1977, *effluent limitations* for point sources \* \* \* which shall require the application of the *best practicable control technology currently available* as defined by the Administrator \* \* \*." (emphasis added).

5. *See* note 3 *supra* (the provision that a permit may be granted after a public hearing.)

6. Act of October 27, 1965, title III § 301, 79 Stat. 1073.

7. Decision of the General Counsel on Matters of Law Pursuant to 40 C.F.R. section 125.-36(m), No. 42, at 4 (1976), (Respondent's Appendix at p. 422).

8. *In re* National Pollution Discharge Elimination System Permit For: Northern Indiana Public Service Co. Bailly Generating Station NPDES No. IN 0000132, NPDES Appeal No. 76–4, at 2–3 (August 10, 1976).

9. 40 C.F.R. § 125.36(*l*)(4) reads in pertinent part:

> "The initial decision of the Regional Administrator shall become the final decision of the Agency unless within ten (10) days after its issuance any party shall have appealed the initial decision to the Administrator pur-

On November 8, 1976, the petitioners filed their first appeal (No. 76–2098) with this court seeking judicial review of the Administrator's decision of August 10, 1976, with respect to Public Law 89–298. On December 7, 1976, the Director of Enforcement of Region V formally issued the NPDES permit to NIPSCO. On March 7, 1977, the petitioners filed their second appeal to this court (No. 77–1262), seeking judicial review of the order of December 7, 1976, issuing the permit. In particular, the appeal challenges the Administrator's decision of August 10, 1976, with respect to Public Law 89–298. By order of May 9, 1977, and by amendment of May 16, 1977, this court ordered the consolidation of the two appeals (Nos. 76–2098 and 77–1262).

### The Jurisdictional Issues

The intervenor in these appeals, NIPSCO, contends that the petitioners are not properly before this court, because they did not exhaust their administrative remedies prior to filing either of the appeals. EPA also contends that appeal No. 76–2098 was premature. We need not pass on that question in view of our holding that the petitioners sufficiently exhausted their administrative remedies in appeal No. 77–1262.

■ With respect to appeal No. 77–1262, NIPSCO first invokes 40 C.F.R. § 125.36(1)(4)[10] as providing that the October 7, 1976, initial decision of the Regional Administrator issuing the permit to NIPSCO, became the final decision of the Agency when an appeal was not taken to the Administrator following this decision. This is a correct reading of the EPA regulations. NIPSCO then argues that such an appeal

was a "prerequisite to judicial review," and since petitioners did not pursue that avenue prior to appealing to this court on March 7, 1977, they have failed to exhaust their administrative remedies. NIPSCO asserts that they have not provided the Agency with an opportunity to correct its errors and to moot judicial controversy, and also that a court of appeals is entitled to the full benefit of the expertise of an administrative agency and of a complete record.

■ NIPSCO has provided this court an accurate reflection of axioms requiring exhaustion of administrative remedies. Nevertheless, NIPSCO has ignored the very axiom which is decisive with respect to the matter at hand. A remedy need not be exhausted if to do so would be a futile gesture. *City Farmers Trust Co. v. Schnader,* 291 U.S. 24, 34, 54 S.Ct. 259, 78 L.Ed. 628 (1934); *Montana Nat'l Bank of Billings v. Yellowstone County,* 276 U.S. 499, 505, 48 S.Ct. 331, 72 L.Ed. 673 (1928); Davis, Administrative Law Treatise, § 20.07, at 99 (1958). This is the case here.

■ The EPA regulations cited by NIPSCO do contemplate that prior to judicial review of a permit, the Administrator must have an opportunity to review the contested issues concerning the permit.[11] Furthermore, the Administrator, in his August 10, 1976, decision following the petitioners' original appeal to him of the General Counsel's decision relative to Public Law 89–298, has recognized that normally an appeal of the General Counsel's decision should not be filed until the Regional Administrator has issued an initial decision on the permit.[12] Nevertheless, this case does not involve the usual situation. The Administrator, also in

suant to paragraph (n)(1) of this section * * *."

40 C.F.R. § 125.36(n)(3) reads in pertinent part: "Any person seeking review of the initial decision of the Regional Administrator by the Administrator shall, within ten (10) days of the initial decision of the Regional Administrator file with the Administrator and mail, by certified mail, to all parties a petition for the Administrator's review. * * * *"

**10.** *Id.*

**11.** 40 C.F.R. § 125.36(n)(6) provides:

"A petition to the Administrator for review of any initial decision of the Regional Administrator pursuant to paragraph (n)(1) of this section is, pursuant to 5 U.S.C. 704, a prerequisite to the seeking of judicial review of the final decision of the Administrator."

**12.** *In re* National Pollution Discharge Elimination System Permit For: Northern Indiana Public Service Co. Bailly Generating Station NPDES No. IN 0000132, NPDES Appeal No. 76–4, at 3 (August 10, 1976).

his August 10, 1976 decision, found that the same EPA regulations which contemplate review after the initial decision on the permit leave some room for interpretation.[13] Further, he decided that since the decision of the General Counsel regarding Public Law 89–298 could "undergo no further refinements prior to the initial decision" on the permit, he would exercise his "inherent discretion" to entertain the petition early.[14] Thus he was given, and he accepted, the opportunity to rule definitively on the sole substantive issue on appeal before this court. The respondent Agency does not now seek further opportunity for review, but instead joins the petitioners' contention that administrative remedies have been properly exhausted. In this context, a second administrative review on the applicability of Public Law 89–298 to the permit would serve no useful purpose.[15]

■ NIPSCO also argues that the petitioners' application for judicial review of the permit in No. 77–1262 has not been filed in a timely and proper manner pursuant to the FWPCA. The Act reads in pertinent part:

> (b)(1) Review of the Administrator's action * * * (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals * *. *Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial* * * *. (emphasis added).[16]

In appeal No. 77–1262, the Regional Director of Enforcement formally issued the permit to NIPSCO on December 7, 1976,

and the petitioners filed this appeal on March 7, 1977, within 90 days of the issuance of the permit. However, NIPSCO contends that December 7 represents a date of "clerical import only." It argues that the "significant date for purposes of filing a petition for review" is November 5, 1976, the date NIPSCO alleges the initial decision of the Regional Administrator "authorizing the issuance of the permit became the final determination of the Agency." This argument is specious. The statute clearly allows an appeal within 90 days of the date of *issue* of a permit, and this 90-day time limit was complied with by petitioners when they filed on March 7, 1977.

Therefore, NIPSCO's contention that the petition for review should be dismissed because this court lacks jurisdiction, is rejected.

### Applicability of Public Law 89–298

We now turn to the merits. For a number of years prior to 1965, industrialists and conservationists waged a battle over the use of the shoreline of Lake Michigan near Burns Ditch, Indiana. Industrialists proposed to develop the area as Burns Waterway Harbor. Conservationists sought to expand an existing Indiana State park and include the area in a proposed Indiana Dunes National Lakeshore Park. Between 1963 and 1965, both sides in this "port versus park" controversy compromised and agreed to the development of a public harbor and a national lakeshore. Legislation to this effect was introduced in both houses of Congress in 1965.

The Public Works and Interior Committees of each house held hearings and mark-

---

**13.** *Id.*

**14.** *Id.*

**15.** The petitioners raise a further argument. They did not receive a letter notifying them of the October 7, 1976, initial decision of the Regional Administrator on the permit until October 26, 1976. The Acting Regional Hearing Clerk granted them a 10-day extension of time to file an appeal to the Administrator. This raises the question whether the 10-day time limit for appeal expired on October 18, 1976, or November 5, 1976, or whether, as petitioners

contend here, the extension of time for appeal was contrary to other Agency regulations so that on the whole, the Agency made it effectively impossible for the petitioners to comply with the 10-day time limit. We need not resolve this dispute at this time because our decision that further exhaustion of administrative remedies would have been futile in No. 77–1262 moots this dispute over impossibility of exhaustion of remedies.

**16.** 33 U.S.C. § 1369(b)(1)(F)(Supp. V 1975).

ed up legislation creating the port and park respectively. The Public Works Committees acted first. In letters and testimony recorded in the House and Senate, considerable support was expressed for pollution controls on industry in the Burns Waterway area. The Bureau of the Budget and the Secretary of the Army both recommended that the State of Indiana furnish assurances satisfactory to the Secretary of the Army that "water and air pollution sources will be controlled to the maximum extent feasible in order to minimize any adverse effects on public recreational areas in the general vicinity of the harbor." [17] The Department of Health, Education, and Welfare; the Department of Interior, and various senators, representatives, and conservation groups all voiced their common concern that pollution in the vicinity of the proposed harbor be controlled.

The Public Works Committee of each house reported out a bill authorizing the development of Burns Waterway Harbor.[18] Although these bills did not contain specific language providing for control of pollution in Burns Harbor, they did authorize the development of the harbor under the "direction of the Secretary of the Army" pursuant to House Document 160.[19] This document contained the recommendation of the Secretary of the Army that:

> * * * the State of Indiana furnish assurances satisfactory to the Secretary of the Army that water and air pollution sources will be controlled to the maximum extent feasible in order to minimize any adverse effects on public recreational areas in the general vicinity of the harbor.

Both committee reports indicated that they had no objection to this provision.[20] After passage of each bill by the respective houses, the conferees from each house wrote this exact language into the bill, and the legislation was enacted.[21]

Despite this rather clear directive that the Secretary of the Army should be furnished assurances regarding control of pollution, Congress did not prescribe a specific water quality standard, treatment standards, schedules of compliance, or the like, to which industry in Burns Harbor need adhere. Moreover, Congress did not confer authority in the Secretary to promulgate such specific standards. Rather, the Secretary was directed to satisfy himself that Indiana would have some methods, presumably some state standards, which would provide maximum feasible protection from pollution in the vicinity of the harbor.

In the House and Senate hearings, there was very little discussion concerning specific measures or precise means to control pollution. Perhaps the most explicit plea for specific standards was made in the House hearings by Sam Ropchan, President of the Fort Wayne Chapter of the Izaak Walton League. He said:

> * * * we ask that you call for provisos specifying conformity to *rigid pollution standards*. At present there are only vague references to pollution in House Document 160. [The document which contained the pollution control recommendation of the Secretary of the Army]. We feel the public is entitled to *better defined assurances* that the irreplaceable natural qualities in the dunes will be protected. (emphasis added).[22]

---

17. Letter of Elmer B. Staats, Deputy Director, Bureau of the Budget, to Cyrus R. Vance, Secretary of the Army (September 24, 1963) (Resp. App. p. 7); letter of Cyrus R. Vance to John W. McCormack, Speaker of the House (September 24, 1963) (Resp. App. p. 13).

18. *See* S.Rep.No.464, 89th Cong., 1st Sess. (July 19, 1965); H.R.Rep.No.973, 89th Cong., 1st Sess. (September 9, 1965).

19. 88th Cong., 1st Sess. (1963) (Resp. App. p. 7).

20. S.Rep.No.464, 89th Cong., 1st Sess., at 23 (July 19, 1965); H.R.Rep.No.973, 89th Cong., 1st Sess., at 161 (September 9, 1965).

21. Act of October 27, 1965, title III, § 301, 79 Stat. 1073.

22. *Hearings Before the Subcommittee on Rivers and Harbors and the Subcommittee on Flood Control of the Committee on Public Works House of Representatives*, 89 Cong., 1st Sess. 655 (1965) [hereinafter cited as *House Hearings.*] (Respondent's Appendix p. 235).

Showing little response, the committee members did not even inquire of Mr. Ropchan what rigid standards or better defined assurances he wished to see enacted into law. Obviously, the Congress rejected his plea, because it enacted into law word-for-word the so-called "vague references" to pollution contained in House Document 160.

Nor did members of Congress indicate at any point in the hearings or in floor debate that they meant the pollution control provision in Public Law 89–298 to be a precise standard. Not one of the specific references to the hearings cited in the reply brief of petitioners supports the proposition that members of Congress intended the pollution control provision to be a precise standard. Rather, the cited materials support the proposition that this provision was only meant to confer upon the Secretary of the Army the authority to require assurances from the State of Indiana that pollution would be controlled to the maximum extent feasible.[23] Remarks by Senator Bayh during the Senate Hearings provide some insight into the Congressional intent to leave the matter of pollution control assurances to the discretion of the Secretary of the Army, and thus to some extent to the Corps of Engineers. He explained that the Corps of Engineers could ask the State of Indiana

to meet certain criteria before the Secretary might be willing to certify that he had received proper assurances about pollution control. But the senator argued that specifics ought not be included in the Federal legislation authorizing the harbor. He continued:

This is the way it is done. I have no doubt this is the way it will be done. * * I ask you to recognize if you can that although you might feel a little bit better if this is all in black and white now, that indeed developments may point out as we look into the design of the port that the original plan for pollution control would not be as good as the ones which might be tailormade to meet the final plan of design.[24]

■ There is significance in the fact that Public Law 89–298 does not contain a specific standard and does not give the Secretary of the Army authority to promulgate precise standards. It lies in the fact that pollution control under a FWPCA permit for discharge of pollutants must not only require the application of the "best practicable control technology currently available,"[25] but must also meet "any more stringent" standard established pursuant to any other Federal law or regulation.[26] If Public

---

Roy B. Crockett and Thomas E. Dustin of the Indiana Division of the Izaak Walton League made a similar written plea for "rigid Federal control standards." *Id.* at 656. (Resp. App. p. 236).

There were very few, if any, other pleas or comments concerning explicit federal control measures. There were some complaints about the inadequacy of Indiana standards. *See* the statement of petitioner Herbert Read, Chairman, Engineering Committee, Save the Dunes Council, Inc., *Hearings Before the Subcommittee on Flood Control—Rivers and Harbors of the Committee on Public Works United States Senate,* 89th Cong., 1st Sess., 374 (1965) [hereinafter cited as *Senate Hearings* ].

23. *See, e. g., House Hearings, supra* note 22, at 653–54, 660, (Respondent's Appendix 233–34, 240); *Senate Hearings, supra* note 22, at 349, 372, 389, 393–94, (Resp. App. at 107, 130, 147, 151–52).

24. *Senate Hearings, supra* note 22, at 383, (Resp. App. at 141).

25. FWPCA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A) (Supp. V 1975).

26. *Id.* § 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C) provides:

"In order to carry out the objective of this chapter there shall be achieved—* * *
"(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations * * * or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter."

The committee report on this provision explains it in the following manner:

"Section 301(b)(1)(C) provides adequate authority to apply new information to existing water quality requirements and upgrade effluent limits accordingly.

"In other words, wherever the Administrator determines that application of the best practicable treatment requirements of Phase

Law 89–298 had provided a precise standard and one more stringent than that required by FWPCA § 301(b)(1)(A), the court would have to direct the Regional Administrator of EPA to heed that stricter standard in the issuance of the permit to NIPSCO. But the public law does not articulate any specific standard. The Act voices only a broadly stated objective, which gives the Secretary of the Army authority to exercise his discretion in obtaining assurances from Indiana of "maximum feasible" pollution control in Burns Harbor.

■ Furthermore, it appears that the Secretary of the Army has already received the required assurances. Public Law 89–298 appropriated $25 million for construction of Burns Waterway Harbor. It was expressly stipulated in the Act that the State of Indiana should be reimbursed for its expenditure of funds in the construction of the harbor. But the reimbursement was to be made only if the construction was approved and supervised by the Chief of the Corps of Engineers.[27] Since the record reveals that the state has received this reimbursement, it seems apparent that the Secretary, through the Corps of Engineers has already been given assurances, satisfactory to him, that the state will control pollution in the harbor to the maximum extent feasible. We think the Secretary's acceptance of Indiana's submission is the end of the matter as regards the applicability of Public Law 89–298.[28] Beyond that, the public law has no application to EPA or to permits issued under the FWPCA.

■ Despite the fact that Public Law 89–298 is a directive to the Secretary of the Army, petitioners contend that the "policy underlying the legislation" is a mandate to the Administrator of EPA. Therefore, they say the law demands that EPA promulgate, or require the State of Indiana to promulgate, stricter standards than are provided by section 301(b)(1)(A) of the FWPCA, and that these stricter standards must be applied in permits issued under the FWPCA. This court is aware of the impact of underlying Congressional policy on legislative interpretation. In *United States v. Sisson*, 399 U.S. 267, 297–98, 90 S.Ct. 2117, 2133, 26 L.Ed.2d 608 (1970), the Supreme Court stated:

> \* \* \* The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that guides us

I will not provide for implementation of *existing water quality standards* for interstate or intrastate streams, he must tighten the requirements against a source of discharge or group of sources." (emphasis added).
*Senate Public Works Committee, Federal Water Pollution Control Act Amendments* of 1977, S.Rep.No.92–174, 92d Cong., 1st Sess., (October 28, 1971), *reprinted in* [1972] *U. S. Code Cong. and Adm. News* 3668, 3710 (Senate bill was passed in lieu of House bill).

27. Act of October 27, 1965, title III, § 301, 79 Stat. 1073.

28. 'The hearing record further supports our contention that all Congress intended in its Public Law 89–298 proviso was for the Secretary of the Army to satisfy himself prior to construction of the harbor that pollution would be controlled to the "maximum extent feasible." Witness the following exchange between Senator Birch Bayh of Indiana and Colonel Pinnell of the Corps of Engineers:
"Senator Bayh. I am curious as to what specific action has to be taken by the State or by the port commission to provide these assurances to the Secretary. At what time can we get an unqualified statement saying that Bethlehem is sufficiently far along, or Midwest is sufficiently far along—pollution plans have been made? Do we need to get these assurances at this particular time, or is this part of the negotiation that goes on between the corps and the State?
"Colonel Pinnell. As a normal matter, sir, and in this case as well, *these assurances are required prior to initiation of construction.* In the instant case the assurances are not required now at this stage although we do have informal assurances.
"Nor would they be required prior to the first appropriation of funds for the project, since the first appropriation of funds is for preconstruction planning purposes. However, *prior to the initiation of construction, the requirements must be met.*
"Senator Bayh. So then this is really a final check that the corps has and the Secretary of the Army has to see that all the necessary prerequisites are present?
"Colonel Pinnell. That is correct." (emphasis added).
*Senate Hearings, supra* note 22, at 345 (Resp. App. at 103).

when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed. * * *

This guidance, however, does not preclude the long held rule that, in construing statutes, courts must look first to the text of the statute itself. *E. g., United States v. Bass*, 404 U.S. 336, 339, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). In the case at hand, the face of Public Law 89–298 is very clear. It gave a directive to the Secretary of the Army, not to the Administrator of EPA. The Act left the matter to the Secretary's discretion; it did not authorize him, and certainly not the Administrator, to promulgate standards. He was to receive assurances of pollution control prior to the construction of the harbor and that was to be the end of the matter. He was not authorized to demand assurances indefinitely. In our opinion, it would be judicial legislation to find that Congressional policy requires the EPA to act in a situation and in a manner clearly not contemplated by the language of Public Law 89–298 or its legislative history.

Petitioners also rely on a report [29] made by the Comptroller General to the Congress on September 20, 1971, about 6 years after the enactment of Public Law 89–298. The General Accounting Office (GAO) made a study to determine if the Secretary of the Army had received the assurances required by the public law from the State of Indiana. The report stated that:

> * * * Certain weaknesses were noted in the State's implementation of its air and water pollution control program which, in GAO's opinion, raise questions regarding the adequacy of the assurances provided. The weaknesses noted resulted primarily from a lack of adequate resources and a need to strengthen the State's laws and regulations. [App. to Petitioner's Brief, pp. 66–67].

It is not clear what petitioners expect to establish by the GAO report. It does not purport to interpret the intention of Congress on the issue before us and it does not say that Public Law 89–298 imposed any duty on the Administrator. In fact, the report clearly recognizes that the Secretary of the Army, rather than the Administrator, had the responsibility for evaluating the assurances of the State of Indiana. At most, the GAO report reflects a difference of opinion between the GAO and the Secretary of the Army regarding the assurances by the State of Indiana; in that connection, the GAO report states:

> The Department of the Army did not agree that the required assurances had not been obtained and stated that the assurances had been interpreted to mean the State's ability and intent to provide the landward facilities on a schedule that would meet the need for the developing traffic. A judgment was made by the Department that such ability and intent had been demonstrated. [App. to Pet. Brief, p. 68].

In our opinion, the GAO report does not support petitioners' interpretation of Public Law 89–298.

▪ If we assume arguendo that Public Law 89–298 required the EPA to apply that law in the issuance of the permit in issue, our holding would be the same. Petitioners have made no showing that any requirements based on the public law would be more stringent than the "best practicable control technology currently available," the standard set out in FWPCA § 301(b)(1)(A). In oral argument, the petitioners stated that the control standard they would like to see applied to the NIPSCO permit is the "best available technology economically achievable"; this is the standard provided in the FWPCA as one to be met no later than July 1, 1983.[30] Petitioners argue that

**29.** Comptroller General of the United States, Environmental and Economic Problems Associated With The Development Of The Burns Waterway Harbor, Indiana (September 20, 1971).

**30.** The statute provides:
"In order to carry out the objective of this chapter there shall be achieved— * * *
"(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point

application of this standard is what the "maximum extent feasible" language of Public Law 89–298 requires. The legislative history of the FWPCA, however, persuades us to reject petitioners' contention. The Senate committee report on the FWPCA Amendments of 1972 explains that the FWPCA standards "are expected to establish the *maximum level of pollution allowable* in interstate waters." (emphasis added).[31] Obviously, in this case, this means that until some future time not later than July 1, 1983, the maximum level of pollution allowable in Burns Harbor is that level which cannot be prevented by the "best practicable control technology currently available." This is the standard applied by EPA in the issue of the NIPSCO discharge permit in question. We do not perceive that any difference in pollution control would result from enforcement of an objective to control pollution to the "maximum extent feasible" on one hand and a standard which establishes the "maximum level of pollution allowable" on the other. Thus, application of the objective stated in Public Law 89–298 would not result in the adoption of a standard more stringent than the applicable standards under the FWPCA.

Our conclusion on this point is buttressed by the legislative history of Public Law 89–298. Petitioners contend that the history "makes repeated reference to the necessity for *extraordinary* pollution control * * *." (emphasis added). This is hardly the case. Of all the witnesses at the hearings, only Sam Ropchan, Roy B. Crockett, and Thomas E. Dustin of the Izaak Walton League asked the Congress to adopt "rigid" control standards.[32] Mr. Ropchan complained that the "maximum extent feasible" language eventually enacted into law was not rigid enough, and he requested the Congress to spell out "better defined assurances" of pollution control.[33] None of the members of Congress voiced a complaint about the language eventually adopted. Obviously, enactment of the language criticized by Mr. Ropchan indicates Congressional disapproval of his suggestion. The Congress does not appear to have regarded Public Law 89–298 as requiring an "extraordinary" pollution control standard. Certainly, in light of the apparent intent of Congress as reflected Public Law 89–298 and in the FWPCA Amendments of 1972, we cannot conclude that the public law warrants the application of a higher standard to the NIPSCO permit in issue than the one which EPA has applied.

### Conclusion

For all of the reasons set out above, the petition of the League is dismissed and the decision of the Administrator on Public Law 89–298 is affirmed.

FAIRCHILD, Chief Judge (dissenting in part).

Although I agree with the treatment of the jurisdictional issues, I respectfully dissent from the majority opinion for the following reasons.

At issue in this case are two differently phrased standards for water pollution control. The first, "maximum extent feasible," was established in 1965 as part of the legislative compromise which created the Burns Harbor Waterway and the Indiana Dunes

---

sources * * * which (i) shall require application of the best available technology economically achievable for such category or class * * *."
FWPCA § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A) (Supp. V 1975).

**31.** The report reads:
"The setting of water quality standards for interstate navigable waters, as indicated above, is the keystone of the present program for control of water pollution. The standards are intended to function * * *

"(1) As a measure of performance * * to establish the maximum level of pollution allowable in interstate waters."
*Senate Public Works Committee, Federal Water Pollution Control Act Amendments* of 1972, S.Rep.No.92–414, 92d Cong., 1st Sess. (October 28, 1971), *reprinted in* [1972] *U. S. Code Cong. & Adm. News*, 3668, 3671. (Senate bill passed in lieu of House bill).

**32.** *House Hearings, supra* note 22, at 655–56, Resp. App. at 235–36.

**33.** Id. at 655, Resp. App. at 235.

National Lakeshore. The second, "effluent limitations reflecting application of best practicable technology," was articulated in the 1972 Federal Water Pollution Control Act as binding on the EPA's permit decision-making. It is unclear from the record, briefs and oral argument whether these two phrases in fact establish two distinct standards, one higher than the other, or are merely a restatement of the same idea.

The record shows that the EPA deemed the 1965 language inapplicable and therefore never determined its meaning. In response to Porter County Isaak Walton League's challenge to the issuance of a NPDES permit to NIPSCO, the General Counsel of the EPA decided that "the [1965] Act on its face does not impose any obligations on parties other than those named in it." Thus, because Congress left the question of the sufficiency of the water pollution control assured by the state to the Secretary of the Army and because the EPA was not in existence at the time, the General Counsel concluded that "Public Law 89–298 has no applicability in establishing effluent limitations of the NPDES permit at issue." In its brief the EPA argues and the majority adopts the view that because the 1965 language is ambiguous it is not really a standard capable of enforcement. Furthermore, the EPA asserts and the majority also adopts the view that even if PL 89–298 presents a more stringent standard than that articulated in FWPCA, responsibility for implementing such standard was left solely to the discretion of the Secretary of the Army and that duty has since been fulfilled.

Section 301(b)(1)(C), however, requires the EPA Administrator to effectuate more stringent standards for pollution control where created by federal or state statute, not just the "best practicable technology," in the granting of section 402 permits. In this case, I cannot see how the EPA can fulfill its duty to implement "more stringent requirements" if the agency does not make a determination what constitutes "maximum feasible control" and expressly states that condition.

"If an order is valid only as a determination of policy or judgment which the agency alone ·is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. . . . [A]n appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Securities Comm'n v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1942).

If there is a difference between the two standards, and if, as petitioners argue, the 1965 is higher, the 1965 standard should control the EPA's permit issuance with regard to Burns Harbor. I would set aside the EPA's decision and remand for determination whether the effluent limitations prescribed in the permit fulfill the 1965 language and, if not, for imposition of limitations which would.