917 F.2d 908
 21 Envtl. L. Rep. 20,351
 CITY OF MOUNT CLEMENS, a Michigan municipal corporation,
Plaintiff-Appellant,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee Thomas,
Administrator of the United States Environmental Protection
Agency; Valdas V. Adamkus, Regional Administrator of the
United States Environmental Protection Agency; and David F.
Hales, Director of the Michigan Department of Natural
Resources, Defendants-Appellees.
 No. 89-1801.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 6, 1990.
Decided Oct. 25, 1990.
 
 Noah Eliezer Yanich, Louis B. Reinwasser (argued), Miller, Canfield, Paddock & Stone, Lansing, Mich., for City of Mount Clemens.
 Carl Strass, Michael P. Healy (argued), John A. Bryson, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for U.S. E.P.A., Lee M. Thomas and Valdas V. Adamkus.
 Roland Hwang, Asst. Atty. Gen. (argued), Natural Resources Div., Lansing, Mich., for David F. Hales.
 Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 On November 7, 1988, plaintiff City of Mount Clemens ("the City") initiated this action to compel defendants: the United States Environmental Protection Agency ("EPA"); Lee M. Thomas, EPA Administrator; Valdas V. Adamkus, EPA Regional Administrator; and David F. Hales, the Director of the Michigan Department of Natural Resources ("MDNR") (collectively "defendants"), to certify the City's local wastewater treatment plant for a federal construction grant. The complaint alleged that defendants' refusal to certify the City's plant is arbitrary and capricious, in violation of the Federal Water Control Act Amendments of 1972 ("the Clean Water Act"), 33 U.S.C. Secs. 1281 et seq., and 40 C.F.R. Secs. 35.100 et seq., the federal regulations governing construction grants for local wastewater treatment plants. On May 1, 1989, the district court entered an order which affirmed the magistrate's March 10, 1989 order limiting discovery to the administrative record and to whether the administrative decision makers complied with federal statutes and regulations. On May 31, 1989, the district court issued a final judgment denying the City's motion for a preliminary injunction to sequester federal funds to satisfy the City's grant application. The district court also granted defendants' motions for summary judgment as the City failed to exhaust its state administrative remedies. For the reasons stated below, we AFFIRM the district court's order limiting the scope of discovery and that portion of its final judgment which denied the preliminary injunction. However, we REVERSE that portion of the district court's final judgment which granted defendants' motion for summary judgment and dismissed the City's case without prejudice.
 
 I.
 A.
 
 2
 In the early 1970s, MDNR, acting in conjunction with EPA, ordered the City to upgrade its wastewater treatment facility. At the time, the City's facility was discharging inadequately treated sewage water into the Clinton River. In 1973, the City entered into a contract to connect to the Detroit Wastewater Treatment Facility ("DWTF"), a large regional sewage treatment facility. In 1980, the City rescinded the contract for non-performance and prevailed against the City of Detroit in federal district court.[1] During the litigation, the district court ordered EPA and MDNR to determine whether the City's plan for a local wastewater treatment facility was eligible for federal funding.[2] Pursuant to federal statutory and regulatory directive, EPA and MDNR were required to determine whether the local plant or the regional plant was the most cost-effective alternative.[3] Under a delegation agreement with EPA,[4] MDNR retained the primary responsibility for reviewing the City's local facility cost-effectiveness analysis ("C/E analysis").
 
 
 3
 In September 1983, the City of Detroit provided a cost estimate and offered regional service to the City. In October 1983, the City submitted a revised facilities plan and C/E analysis to MDNR, concluding that the proposed local plant was more cost-effective than the regional plant. In a December 29, 1983 letter, MDNR responded to the City by stating that the absence of an acceptable C/E analysis was a major impediment to certifying the facilities plan and environmental assessment to EPA. Because the local project cost had escalated, MDNR explained that the City's previous plan had been rendered obsolete. MDNR advised the City that its C/E analysis must exclude "sunk costs" or those costs representing previous investments in the regional plant. MDNR concluded that the costs assessed to the regional plant could include only true operating and maintenance costs, in addition to the City's share of expected future capital costs required to improve water quality.
 
 
 4
 After reviewing the City's revised C/E analysis, MDNR asked EPA for technical assistance in February 1984. The City maintained that it had reasonably relied upon DWTF's sewer service charges in calculating the operation, maintenance and replacement costs for the regional plant. EPA responded that DWTF's sewer service charges included "debt retirement," which was a "sunk cost" that could not be included in the City's cost comparisons of the regional plant and the proposed local plant.
 
 
 5
 In July 1984, the City submitted another C/E analysis to meet EPA's requirements. In the revised C/E analysis, the City stated that the regional plant had an estimated annual cost of $2,405,411 to be compared with the local plant's estimated annual cost of $2,301,578. After reviewing the City's calculations, EPA concluded that the City had used questionable baseline figures, erred in its present worth calculations, and inflated the estimated annual cost of the regional plant.
 
 
 6
 On July 11, 1985, MDNR officials telephoned EPA officials to state that as a result of threatened litigation by the City, MDNR would approve the City's C/E analysis for a local wastewater treatment plant. MDNR requested EPA's continued technical assistance in reviewing the City's facilities plans and emphasized the strong federal interest in resolution of the conflict. In a July 12, 1985 letter to EPA, MDNR stated:
 
 
 7
 In accordance with the 1982 delegation agreement between the U.S. Environmental Protection Agency and the Michigan Department of Natural Resources, we certify that the [City's Facilities] Plan complies with [40 C.F.R. Sec. 35.917]. The Facilities Plan consists of those necessary plans and studies which directly relate to treatment works needed to comply with enforceable requirements of the Act. The Facilities Plan contains a thorough evaluation of alternatives and the selected alternative is implementable and is cost effective.
 
 
 8
 Brief for the Federal Appellees at 14, City of Mount Clemens v. United States Environmental Protection Agency, et al., No. 89-1801 917 F.2d 908 (6th Cir.1990) (quoting letter from MDNR to EPA (July 12, 1985)).
 
 
 9
 On August 2, 1985, the City's engineers telephoned EPA and inquired as to the status of the City's application for federal funds to finance its proposed local plant. EPA explained that it could not complete the environmental review because it was uncertain as to whether the local plant or the regional plant would be more cost-effective. EPA contended that future capital improvements in the DWTF could not be added to the cost of the regional plant in the City's C/E analysis. In an August 8, 1985 memorandum, MDNR memorialized its opposition to EPA's approach to the City's C/E analysis. MDNR argued that when reviewing a previous project, EPA had allowed a local agency to prorate a portion of future improvements to a regional plant and add those costs to the regional plant cost estimates of its C/E analysis. On October 2, 1985, EPA responded that in the City's current C/E analysis, inclusion of future capital improvements in the DWTF as an additional cost of the regional plant would be appropriate only if the improvements would be required by the City's increased use of the regional plant, as opposed to the City's use of the proposed local plant. EPA also questioned the methodology used in the City's C/E analysis and concluded that the City's local plant total cost estimate was one-half the cost estimates historically submitted for similar facilities.
 
 
 10
 On February 11, 1986, MDNR adopted EPA's position and informed the City that its local plant was not eligible for grant funding because of deficiencies in its environmental assessment and facilities plan. MDNR specifically informed the City that its C/E analysis: (1) improperly included the costs of capital improvements to the regional plant; and (2) underestimated, based on MDNR and EPA experience, the operating, maintenance and repair costs of the local plant. On April 25, 1986, MDNR informed the City, in writing, that its local plant facilities plan had been rejected. MDNR also advised the City of its right to seek review.
 
 
 11
 After a December 3, 1986 meeting with the City and MDNR, EPA agreed to conduct another review of the City's local plant facilities plan. On December 19, 1986, the City requested that EPA formally respond to its C/E analysis. When EPA failed to respond, the City sought the assistance of United States Senator Donald W. Riegle, Jr. (D-Michigan) ("Senator Riegle"). In a February 20, 1987 letter, the EPA regional administrator explained to Senator Riegle that the City had failed to demonstrate that its proposed project met the cost-effectiveness provisions of the Clean Water Act. Thus, the City's proposed local wastewater treatment plant was deemed ineligible for federal grant assistance.
 
 
 12
 In an April 14, 1988 letter to MDNR, the City claimed a right to federal funding based on its MDNR-assigned priority ranking of nine for the local plant. The City also complained that it had never received adequate written notice of the deficiencies in its C/E analysis and formally protested the distribution of federal funds to other localities until after the City's project had been funded. MDNR responded to the City on April 18, 1988, explaining that a priority ranking of nine did not qualify the City for federal funding as it had failed to submit an acceptable C/E analysis. MDNR denied approval of the City's local plant facilities plan due to concerns that had been identified in its February 11, 1986, and April 25, 1986 letters to the City, as well as EPA's February 20, 1987 letter to Senator Riegle. MDNR then denied the City's request to stop the distribution of funds to other projects. MDNR concluded that the City had received adequate written notice of its failure to meet the Clean Water Act funding criteria.
 
 B.
 
 13
 On November 7, 1988, the City filed this suit in the United States District Court for the Eastern District of Michigan.[5] The City complained that EPA and MDNR had acted arbitrarily and unlawfully in failing to fund its local wastewater treatment plant. The City sought a declaratory relief, as well as an injunction barring defendants from continuing their allegedly unlawful acts. On January 12, 1989, the City requested a preliminary injunction to sequester a substantial portion of the construction grant funds appropriated to the State of Michigan for fiscal year 1989. Under the preliminary injunction, the grant funds would have been released only after a decision on the merits.
 
 
 14
 Preparing for trial, the City served interrogatories, document requests, and deposition notices upon defendants, who subsequently resisted discovery. The City filed a motion to compel discovery against EPA on February 22, 1989. On February 23, 1989, EPA moved: (1) for a protective order to prevent exploration of the agency officials' mental processes in deciding not to award a construction grant; and (2) to limit the scope of discovery to determining the completeness of the administrative record. On February 27, 1989, MDNR moved for a protective order on the same grounds offered by EPA. The district court referred the discovery motions to a magistrate.
 
 
 15
 On March 1, 1989, both EPA and MDNR filed motions seeking dismissal of the complaint or, in the alternative, summary judgment. EPA also filed a response in opposition to the City's motion for preliminary injunction.
 
 
 16
 The magistrate denied the City's motion to compel discovery on March 10, 1989. The magistrate ordered: "assuming without deciding ... that [the City] is entitled only to a record review," both the motion to compel and the protective order would be granted in part to the extent that the City would be allowed to depose agency officials concerning:
 
 
 17
 1) whether any particular factors or considerations, which are not contained in the agency record which may be suggested by [the City], were or were not considered (and the reasons therefore) before the final denial of [the City's] requests were made; and
 
 
 18
 2) whether the agency's own regulations were followed in denying [the City's] requests.
 
 
 19
 Joint Appendix at 347 (quoting City of Mount Clemens v. United States Environmental Protection Agency, et al., No. 88-CV-74445-DT (E.D.Mich. Mar. 10, 1989) (magistrate's order denying motion to compel discovery)).
 
 
 20
 On March 24, 1989, the City filed objections to the magistrate's order restricting discovery. Appealing to the district court, the City argued that it was entitled to a de novo trial review of both EPA's and MDNR's decisions, and thus, full discovery would be required. The district court, however, affirmed the magistrate's order on May 1, 1989. It explained that the City had not demonstrated that de novo review of EPA's and MDNR's decisions was warranted; and therefore, such review would be based on the administrative record. The district court also determined that EPA's and MDNR's fact finding procedures had not been inadequate. This determination was based, in part, on the district court's finding that the City's local wastewater treatment plant project had not been fully certified by MDNR in 1985. The district court also found that the City had not presented evidence to support its argument that either EPA or MDNR were motivated by predisposition or bias.
 
 
 21
 On May 8, 1989, the district court held a hearing on the City's motion for a preliminary injunction and EPA's and MDNR's motions for summary judgment. Ruling from the bench, the district court: denied the preliminary injunction; determined that the sequestration of federal construction funds would not be in the public interest; and concluded that the City was unlikely to succeed on the merits of its claim. The district court also granted summary judgment in favor of defendants, holding that the City had failed to pursue and exhaust state administrative remedies. On May 31, 1989, the district court issued a final judgment in favor of defendants and dismissed the City's case without prejudice. On June 28, 1989, the City filed a timely notice of appeal with this court.
 
 II.
 
 22
 Federal Rule of Civil Procedure 56(c) permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As we consider the appropriateness of summary judgment in the case at bar, we must examine the record, taken as a whole, to determine whether the non-moving party has raised a genuine issue of material fact. See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The district court's grant of summary judgment in favor of defendants must be reviewed de novo. See Pinney Dock & Transport Co. v. Pennsylvania Central Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).
 
 
 23
 The decision to grant or deny a preliminary injunction is within "the sound judicial discretion of the trial court." See Tyson Foods, Inc. v. McReynolds, 865 F.2d 99, 101 (6th Cir.1989). In reviewing the City's appeal from the district court's order denying its motion for a preliminary injunction, we are limited to determining whether the district court abused its discretion. See Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 564 (6th Cir.1982).
 
 
 24
 Similarly, it has long been held that "the scope of discovery is within the sound discretion of the trial court." Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1240 (6th Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981). Thus, in reviewing the City's appeal from the district court's order limiting discovery, we will not disturb the district court's ruling unless there was a clear abuse of discretion. See id.
 
 A.
 
 25
 On appeal, the City argues that the district court erred in granting defendants' motions for summary judgment on the ground that the City failed to exhaust its state administrative remedies. The City contends pursuit of such remedies would inevitably prove to be an exercise in futility. Defendants respond that the district court properly granted summary judgment against the City. We disagree.
 
 
 26
 In Robinson v. Dow, 522 F.2d 855 (6th Cir.1975), we emphasized that "the exhaustion doctrine restricts untimely judicial intervention into agency proceedings until the administrative action has run its full course." Id. at 857. The primary purpose of the exhaustion doctrine is to allow the administrative agency to engage in fact finding; to exercise its special competence and correct its errors; and to reach a dispositive solution so as to make judicial intervention unnecessary. See id.; Cutler v. Hayes, 818 F.2d 879, 891 (D.C.Cir.1987). Our support of the exhaustion doctrine, however, was appropriately qualified in Shawnee Coal Co. v. Andrus, 661 F.2d 1083 (6th Cir.1981):
 
 
 27
 Although exhaustion of administrative remedies is typically required as a condition for judicial review, the requirement is not absolute. The doctrine must be applied in each case with an understanding of its purposes and the particular administrative scheme involved. Where pursuit of administrative remedies does not serve the purposes behind the exhaustion doctrine, the courts have allowed a number of exceptions. Thus, exhaustion is not required if administrative remedies are inadequate or not efficacious; [or] where pursuit of administrative remedies would be a futile gesture....
 
 
 28
 Id. at 1093 (citations omitted). See also Mathews v. Diaz, 426 U.S. 67, 76, 96 S.Ct. 1883, 1889, 48 L.Ed.2d 478 (1976) (where the only issue presented for review was the constitutionality of a provision of the Social Security Act, exhaustion of administrative remedies would have been futile); Cutler, 818 F.2d at 891 ("Since the [exhaustion] doctrine is not linked to the power of the court to entertain actions, but instead implicates prudential considerations, the exhaustion requirement may be ... disregarded by the court when application of the doctrine would be futile."); Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle, 571 F.2d 359, 363 (7th Cir.) ("A[n administrative] remedy need not be exhausted if to do so would be a futile gesture."), cert. denied, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978).
 
 
 29
 In the case at bar, the City initially argues that its pursuit of additional state administrative remedies would have been futile because MDNR stipulated, in the state court proceedings, that it would refuse to certify the City's local wastewater treatment plant for federal funding:
 
 
 30
 The MDNR stipulates that if the City relies on its current application and the documentation, materials and facts presented to the MDNR in support of that application, the City's application for a grant to fund its wastewater treatment facility would not be certified to the U.S. Environmental Protection Agency.
 
 
 31
 Joint Appendix at 1380 (quoting City of Clemens v. Michigan Department of Natural Resources, No. 88-62430-AA (Ingham Cty.Cir.Ct. Mar. 27, 1988) (stipulation of fact)). The City did not execute the final joint stipulation until September 8, 1989, which was after the district court issued its May 31, 1989 final judgment in this case. MDNR, however, executed an earlier, but quite similar, version of the stipulation on March 27, 1989. MDNR is not bound to its stipulation in the proceedings before this court.[6] But the stipulation does evidence the City's contentions that MDNR had committed itself to not certify the City's proposed local plant project; that MDNR had no intention of reconsidering the matter; and that if the City had filed an additional appeal with MDNR, such appeal would have proved futile. See, e.g., Etelson v. Office of Personnel Management, 684 F.2d 918, 925 (D.C.Cir.1982) ("When an agency ... has made known that its general views are contrary to those of the complainant, and has never given an inkling that it would consider a matter afresh, and when the regulations in question have received careful attention within and outside the agency, a complainant need not make a pro forma request that the agency redo its system.").
 
 
 32
 In addition, the City argues that MDNR could not certify the local plant project because MDNR's hands were tied by EPA. When the City first submitted its application for federal funding of a local wastewater treatment plant, EPA delegated review authority to MDNR, but EPA also stated its intention to remain involved in the project at key decision-making points. In August 1985, MDNR provided EPA with documents indicating that the local plant would be slightly more cost-effective than the regional plant. Although EPA stated that the City could not include future capital improvements to the regional plant in its C/E analysis, MDNR disagreed and argued that in previous cases, it had been advised by the EPA that the methodology employed by the City was acceptable. EPA responded that future capital improvements could not be assessed to the regional plant unless they were necessitated by the City's connection to the regional system. MDNR countered that it had been clear from the filing of the City's initial application that no additional facilities would be required for the regional plant to accommodate the City's sewage. In February 1986, with little explanation, MDNR adopted EPA's position and informed the City that its proposed local plant would not be eligible for federal funding. In February 1987, the EPA regional administrator advised Senator Riegle that the City would not receive a federal grant because it had failed to prove that the local plant project was cost-effective. Thus, the record indicates that MDNR's decision not to certify the City's project for federal funding was essentially dictated by EPA. Cf. Board of Education v. Harris, 622 F.2d 599, 607 (2d Cir.1979) ("[W]here resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its 'special competence' in a manner hostile to petitioner, courts need not bow to the primary jurisdiction of the administrative body."), cert. denied, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981).
 
 
 33
 Our review of the record persuades us that the City did not deliberately flout state administrative procedures. The City, however, did correctly conclude that further administrative review would have proved futile. See Etelson, 684 F.2d at 925; Shawnee Coal, 661 F.2d at 1093. Given the facts of this case, we have determined that the purposes underlying the exhaustion of remedies doctrine would not be served by requiring the City to file additional appeals with MDNR or to pursue alternative state administrative remedies. See Shawnee Coal, 661 F.2d at 1093; Cutler, 818 F.2d at 891. Accordingly, we conclude that the district court erred in granting summary judgment to defendants on the ground that the City failed to exhaust its state administrative remedies.[7]
 
 B.
 
 34
 The City next argues that the district court erred by refusing to grant its motion for a preliminary injunction to sequester federal funds, under the Clean Water Act, sufficient to satisfy the City's grant application for a local waste water treatment plant. Defendants contend that the district court properly denied the City's motion. We agree.
 
 
 35
 In Tyson Foods, Inc. v. McReynolds, 865 F.2d 99 (6th Cir.1989), we stated that:
 
 
 36
 In determining on appeal whether the district court abused its discretion in granting or withholding preliminary injunctive relief, this circuit has set forth four standards which must be considered: (1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merit[s]; (2) whether the plaintiffs have shown irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; (4) whether the public interest would be served by issuing a preliminary injunction.
 
 
 37
 Id. at 101 (citations omitted).
 
 
 38
 Applying the Tyson Foods analysis to this case, we conclude that the district court did not abuse its discretion in denying the City's motion. First, the district court considered several indicators before determining that the City failed to show a strong likelihood of success on the merits. See State of Ohio ex rel. Celebresse v. N.R.C., 812 F.2d 288, 290 (6th Cir.1987) ("[T]he demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless"). Initially, the City did not present sufficient evidence indicating that EPA acted arbitrarily and capriciously in reviewing its facilities plan and C/E analysis. The record evidence, however, indicates that EPA and its delegatee, MDNR, conducted a careful review of the City's grant application over a five year period. In addition, because courts must grant substantial deference to EPA's and MDNR's interpretation of the applicable federal statutes and regulations, the City is unlikely to prevail with its own interpretation. See Cutler, 818 F.2d at 891 (explaining that before disturbing agency decisions, courts must allow agencies to exercise their discretion and to utilize their expertise). Given these considerations, the district court correctly concluded that the City is unlikely to succeed upon the merits of its case.
 
 
 39
 Second, the district court properly determined that the City failed to show irreparable injury. Although the City argued that a judgment would be meaningless if all of the construction grants were used to fund other projects, the district court found that, under the current regulatory scheme, funds would be available to fund the City's project through 1991 and undispersed funds could be recaptured and redistributed after 1991. In addition, the record indicates that the City remains eligible for federal loan funds even if it is unable to secure a federal grant. Moreover, the City's local wastewater treatment plant has already been financed with local funds and is near completion. Thus, the City is not faced with the prospect of irreparable injury; the City is merely seeking alternative funding sources.
 
 
 40
 When applying the third and fourth Tyson Foods factors to this case, the district court determined that a preliminary injunction would harm others, and for similar reasons, would not serve the public interest. The district court correctly concluded that sequestration of the federal funds would interfere with MDNR's ability to allocate funds as needed, and thus, would preclude the funding of other certified projects in the State of Michigan. See United States v. City of Detroit, 720 F.2d 443, 451 (6th Cir.1983) (holding that the district court violated the separation of powers doctrine and undermined the public interest by improperly sequestering Clean Water Act funds in favor of the City of Detroit). Given the City's failure to demonstrate a high probability of success on the merits and its dubious showing on the remaining Tyson Foods factors, we hold that the district court did not abuse its discretion in denying the City's motion for a preliminary injunction.
 
 C.
 
 41
 The City also argues that the district court erred in limiting discovery to the completeness of the administrative record and to whether EPA and MDNR officials followed the applicable federal statutes and regulations. Defendants contend that the district court did not abuse its discretion in limiting the scope of discovery sought by the City. We agree.
 
 
 42
 To secure discovery outside of the administrative record, the City argues that it is entitled to a trial de novo. See 5 U.S.C. Sec. 706(2)(F) ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.") (emphasis added). Although the general rule limits judicial review of agency decisions, the City relies upon an exception to the rule which allows de novo review where the administrative action is "adjudicatory in nature and the agency factfinding procedures are inadequate." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The City, however, has failed to persuade us that this case falls within the exception, as opposed to the parameters of the general rule. See 5 U.S.C. Sec. 706(2)(A) (limiting judicial review of agency action, unless the action is deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").
 
 
 43
 The City argues that the exception is applicable because MDNR certified the City's local plant project for federal funding, but subsequently reversed its decision. MDNR, however, never actually stated that the City's project complied with all federal statutes and regulations. MDNR, acting as EPA's delegatee, merely certified that the City's project met an initial level of federal regulatory criteria. See 40 C.F.R. Sec. 35.917 (defining Step 1 of the facilities plan approval process). Because this was a preliminary level of review, MDNR's certification reversal did not require an adjudicatory proceeding. See 40 C.F.R. Sec. 35.917-8 (stating that Step 1 approval of a facilities plan "will not constitute an obligation of the United States" to fund the proposed project). In addition, MDNR's delegation agreement with EPA did not expressly provide for an adjudicatory proceeding to resolve project certification reversals. As a grant applicant adversely affected by MDNR's action, however, the City could have sought regional EPA review. See 40 C.F.R. Sec. 35.3030. But the City did not request such review, and thus, failed to invoke its right to an adjudicatory proceeding.
 
 
 44
 The City next contends that it has produced compelling evidence that EPA was biased against funding the local plant project. However, in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court established an evidentiary standard which the City has failed to meet:
 
 
 45
 [I]nquiry into the mental processes of administrative decision makers is usually to be avoided. And where administrative findings were made at the same time as the decision ... there must be a strong showing of bad faith or improper behavior before such inquiry may be made.
 
 
 46
 Id. at 420, 91 S.Ct. at 825 (emphasis added) (citations omitted). In the case at bar, the City has failed to show that EPA was motivated by bad faith. The record indicates that after completing a timely and reasoned review, EPA deemed the City's local plant facilities plan and C/E analysis to be unacceptable. Admittedly, EPA expressed, on numerous occasions, its preference that the City connect to the DWTF. However, since the Clean Water Act requires EPA to fund only the most cost-effective projects, it cannot be said that EPA acted in bad faith by encouraging the City to connect to an existing regional plant, as opposed to constructing a new local plant. See 33 U.S.C. Secs. 1281, 1283-84. The City's unsubstantiated allegation that EPA acted in bad faith, when compared to the record of EPA's reasoned project evaluations and careful certification procedures, does not warrant an exception to the general rule that review of agency action is limited to the administrative record. See Animal Defense Council v. Hodel, 840 F.2d 1432, 1438 (9th Cir.1988), modified, 867 F.2d 1244 (9th Cir.1989). We, therefore, conclude that the district court did not abuse its discretion by limiting the scope of discovery sought by the City.
 
 III.
 
 47
 Accordingly, we AFFIRM the district court's order limiting the scope of discovery and that portion of its final judgment which denied the preliminary injunction. However, we REVERSE that portion of the district court's final judgment which granted defendants' motion for summary judgment and dismissed the City's case without prejudice. Finally, we REMAND this case for further proceedings consistent with this opinion.
 
 
 
 [1]
 Since 1977, EPA, MDNR, the City of Detroit, and many of Detroit's suburban city neighbors, have been parties in lawsuits initiated to resolve disputes over the management of wastewater and sewage treatment facilities in the Greater Detroit Metropolitan Area. For a general history of this litigation, see United States v. Detroit, 476 F.Supp. 512 (E.D.Mich.1979), later proceeding, United States v. City of Detroit, 720 F.2d 443 (6th Cir.1983), later proceeding, County of Oakland v. Berkley, 742 F.2d 289 (6th Cir.1984)
 
 
 [2]
 Under Title II, the Federal Water Pollution Control Act Amendments of 1972 ("the Clean Water Act"), 33 U.S.C. Secs. 1281 et seq., EPA is authorized to make federal grant funds available to municipalities involved in the construction of publicly owned wastewater treatment plants. Congress annually appropriates construction grant funds; EPA allots the federal funds to the states under a statutory formula. 33 U.S.C. Sec. 1285. Each state lists, in order of need, how the allotment is to be distributed. 33 U.S.C. Sec. 1284(a)(3); 40 C.F.R. Sec. 35.2015. The state subsequently provides EPA with its priority certification. 40 C.F.R. Sec. 35.2042(a)
 After the state has certified that a specific project is entitled to priority, the municipality may submit an application to EPA including plans, specifications, and cost estimates for the proposed project. EPA then determines whether the statutory and regulatory criteria have been met by the project, thus enabling it to receive a construction grant award. See 33 U.S.C. Secs. 1281, 1283-84; United States v. City of Detroit, 720 F.2d 443, 446 (6th Cir.1983).
 
 
 [3]
 Under the Clean Water Act, Title II grants may only be awarded to the most cost-effective project for addressing a water pollution problem in a specific geographic area. See 33 U.S.C. Sec. 1298. In light of environmental and social considerations, the applicant for a federal construction grant must demonstrate that its project is the most economical means of meeting effluent and water quality goals in its specific geographic area. See id
 The applicant must submit to EPA, or the EPA's delegatee, a completed facilities plan, which includes an environmental impact statement and a cost-effectiveness analysis ("C/E analysis"). 40 C.F.R. Sec. 35.917. A C/E analysis is "performed to determine which waste treatment management system or component part will result in the minimum total resource costs over time to meet Federal, State, or local requirements." 40 C.F.R., Pt. 35, Subpt. E, App. A(4)(b). Project costs include, but are limited to: construction, operation, maintenance and replacement costs. 33 U.S.C. Sec. 1298(b).
 
 
 [4]
 By means of a delegation agreement, EPA may delegate to a state a portion of its grant application review responsibilities. 33 U.S.C. Sec. 1285(g); 40 C.F.R. Secs. 35.912, 35.3000. The state then provides EPA with a written certification that based on the grant application, the specific project meets all applicable federal requirements within the scope of review authority delegated to the state. 40 C.F.R. Secs. 35.2042(b)(1), 35.3020
 
 
 [5]
 Prior to filing its complaint in federal district court, the City initiated proceedings in state court. On October 20, 1988, the City filed a petition for review in Ingham County Circuit Court, Michigan, naming MDNR as respondent. See City of Mount Clemens v. Michigan Department of Natural Resources, No. 88-62430-AA (Ingham Cty.Cir.Ct. filed Oct. 20, 1988). MDNR moved for dismissal, arguing that the City had failed to exhaust its state administrative remedies. The state court subsequently asked for a stipulation that: (1) the City would not amend its application for federal funding of its local wastewater treatment plant; and (2) MDNR would reject the City's application in its present form. MDNR signed the proposed stipulation on March 28, 1989. See Joint Appendix at 1380 (quoting City of Mount Clemens v. Michigan Department of Natural Resources, No. 88-62430-AA (Ingham Cty.Cir.Ct. Mar. 28, 1989)). The City, however, did not sign the joint stipulation until September 8, 1989. The state court apparently denied summary disposition of the case in an oral ruling, but did not enter a final judgment
 
 
 [6]
 The City contends that the state court's refusal to dismiss its case constituted a judgment that further state administrative review by MDNR would have been futile. The City continues that the federal district court should have given res judicata effect to the state court judgment. We find the City's contentions to be meritless as no state court judgment had been entered prior to the entry of the district court's May 31, 1989 final judgment in this case. See Michigan Court Rule 2.602 (all judgment must be in writing, dated and signed by the court). In addition, a denial of a motion to dismiss is not the type of judgment that is given res judicata effect. See, e.g., Diaz v. Indian Head, Inc., 686 F.2d 558, 562-63 (7th Cir.1982)
 
 
 [7]
 Anticipating that this court would hold that the district court erred in granting summary judgment on the ground that the City failed to exhaust its state administrative remedies, EPA urges us to affirm the summary judgment on alternative grounds. EPA argues that: (1) the federal funds sought by the City would constitute a forbidden reimbursement grant because the local plant is nearly completed; and (2) the City's local plant project is not eligible for federal funding because it is not on Michigan's currently fundable project priority list. Because these arguments were not addressed by the district court and additional fact finding would be required to resolve the issues raised, we decline EPA's invitation to affirm summary judgment on these alternative grounds. However, to provide EPA's arguments with a proper hearing and to grant the City an opportunity to respond, we will remand for a ruling from the district court. See Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970) ("When attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court.")