**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**CITY OF DETROIT, et al.,
Defendant-Appellees,**

v.

**COUNTY OF MUSKEGON,
Intervenor-Appellant.**

No. 82–1818.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 31, 1983.

Decided Oct. 26, 1983.

Harry J. Knudsen argued, Knudsen, Wasiura & Associates, Muskegon, Mich., for County of Muskegon.

Leonard R. Gilman, U.S. Atty., argued, Mark R. Werder, Asst. U.S. Atty., Detroit, Mich., for the U.S.

Frank J. Kelley, Atty. Gen. of Mich., Louis J. Caruso, Sol. Gen., Thomas J. Emery, Lansing, Mich., for State of Mich.

William L. Cahalan, Joseph B. Klein, Detroit, Mich., for Wayne County Dept. of Health-Air Pollution Control.

James A. Smith, Kathleen A. Lieder, Detroit, Mich., for Macomb County.

Richard J. McClear, Robert J. Franzinger argued, Terrence E. Haggerty, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., William P. Hampton, Davidson, Gotshall, Kohl, Secrest, Wardle, Lynch & Clark, Farmington Hills, Mich., for City of Detroit and Detroit Water and Sewerage Dept.

Before MERRITT and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

This case originated as a compliance action initiated in 1977 by the United States, at the request of the Environmental Protection Agency (EPA), against the City of Detroit (Detroit), the Detroit Water and Sewerage Department (DWSD), and the State of Michigan (Michigan), predicated upon defendants' alleged discharge of effluents and pollutants from wastewater and sewage facilities into navigable waters in violation of the Federal Water Pollution Prevention and Control Act, 33 U.S.C. § 1251 et seq. (FWPCA). On September 11, 1977 a Consent Judgment was entered mandating compliance by defendants in such matters as financing, use charges, industrial cost recovery, local capital cost funding systems, industrial waste control, staff training, operation and maintenance, facilities planning, sludge disposal, secondary treatment, phosphorous removal, effluent limitations, reporting and other miscellaneous matters. Specific dates for compliance in each area were incorporated into the judgment.

By October 1978, defendants had failed to comply with various provisions of the Consent Judgment and the district court appointed a monitor to study the operation of the Detroit sewer facilities and recommend to the court viable remedies. After receiving the monitor's report and subsequent to extensive hearings in February and March of 1979, the district court determined that Detroit had failed to comply with the Consent Judgment. The Mayor of the City of Detroit was appointed Administrator for the Detroit wastewater treatment facilities and empowered to control, manage and operate the plant so as to achieve compliance with the Consent Judgment at the earliest possible date. United States v. City of Detroit, et al., 476 F.Supp. 512 (E.D.Mich. 1979).

In April 1980, the consent judgment was amended after a separate action was initiated against the City of Detroit by the United States which prayed for relief from Detroit's alleged violations of the Clean Air Act, 42 U.S.C. § 7401 et seq. In the detailed Amended Consent Judgment defendants committed themselves to achieve compliance with the provisions of the Clean Air Act and the FWPCA, principally through construction of treatment facilities. At a hearing conducted on July 6, 1981, the district court was informed that funds in the amount of approximately $100 million would be required to construct major capital improvements at the wastewater treatment facility and thereby achieve compliance with the Amended Consent Judgment. The Court was further advised that defendants did not have sufficient state or local monies to fund the projects.

In August, 1981, the City of Detroit filed a "Petition to Reallocate Unobligated (Unrescinded) Grant Funds and/or for Instruction Re Consent Judgment Mandated Projects", effectively requesting the district court to either reserve federal funds for Detroit or else grant relief from the Amended Consent Judgment. An under-

standing of this motion necessitates familiarization with various federal and state statutory frameworks which are discussed *seriatim.*

Title III of the FWPCA, 33 U.S.C. §§ 1311–28, establishes pollutant limitations and provides for EPA enforcement thereof. Title II of FWPCA, 33 U.S.C. §§ 1281–97, authorizes the issuance of federal grants for the construction of treatment works. It is fundamental that Title III compliance may be sought by the EPA without a corresponding conditioning of Title II grant funds. *State Water Control Board v. Train,* 559 F.2d 921 (4th Cir.1977).

Reduced to its essentials, Title II, Grants for Construction of Treatment Works, authorizes the Administrator of the EPA to issue grants for construction of treatment works. 33 U.S.C. § 1281(g)(1). Annually each state is "allotted" a certain percentage of that fiscal year's appropriations. 33 U.S.C. § 1285(a).[1] The allotment percentage of the total federal fiscal appropriation reserves to each state a sum certain for various environmental projects. A state is precluded from utilizing *allotted* funds, however, until such funds have been *"obligated"* by the Administrator. Congress has defined the procedure by which obligation may be effected. An applicant for a federal grant must initially submit to the Administrator for approval various plans, specifications, and estimates for each proposed treatment works project. 33 U.S.C. § 1283. Before approving a grant for any proposed project, the Administrator *"shall determine",* inter alia, (1) that such works have been certified by the appropriate State water pollution control agency as entitled to priority over other State projects, (2) that the applicant has agreed to pay the non-federal costs of the project (generally 25%) and has made adequate provision for assuring proper and efficient operation of the facility in accordance with a plan of operation approved by the State water pollution control agency, (3) that the size and capacity of such works relates directly to the needs to be served by such works, including sufficient reserve capacity and (4) that no specification for bids in connection with such works has been drafted in a manner as to contain proprietary, exclusionary, or discriminatory requirements. 33 U.S.C. § 1284(a). The Administrator may not approve a grant unless it is first determined that the applicant (A) adopted or will adopt a system of charges to assure that each recipient of waste treatment services will pay its proportionate share of the costs of operation and maintenance, and (B) has legal, institutional, managerial and financial capability to insure adequate construction, operation and maintenance of treatment works. 33 U.S.C. § 1284(b)(1)(A) and (B). Also, the grant must provide that the engineer or engineering firm supervising construction or providing architect engineering services during construction shall continue its relationship to the grant applicant for a period of one year after the completion of construction. 33 U.S.C. § 1284(d)(1). One year after the completion of construction the owner and operator of such treatment works must certify to the Administrator that the completed treatment works conforms to the design specifications and effluent limitations incorporated into the grant agreement and permit. 33 U.S.C. § 1284(d)(2). In sum, allotted monies become obligated only when an application is made to the EPA, the state certifies the project as one of priority, and the EPA approves the application after ascertaining that criteria mandated by the Congressional enactment have been satisfied.

Allotted Title II funds are available for obligation for a period of one year. The Administrator is under a statutory duty to reallot unobligated funds to the other states at the expiration of the fiscal year:

> Any sum allotted to a State under subsection (a) of this section shall be available for obligation under section 1283 of this title on and after the date of such allotment. Such sums shall continue available for obligation in such State for a period

1. In fiscal year 1981 Michigan was allotted approximately 4.1% of the funds appropriated to the various states under 33 U.S.C. § 1284. *See:* 40 C.F.R. § 35.910(a).

of one year after the close of the fiscal year for which such sums are authorized. Any amounts so allotted which are not obligated by the end of such one-year period *shall be immediately reallotted* by the Administrator, in accordance with regulations promulgated by him, generally on the basis of the ratio used in making the last allotment of sums under this section. * * *

33 U.S.C. § 1285(b)(1) (emphasis added). Regulations also require the Administrator to "immediately reallot" the funds to the other states to the total exclusion of the state from which the unobligated funds originated. 40 C.F.R. § 35.2010(b).[2]

Michigan has promulgated legislation to provide procedures for establishing the priority of eligible projects and for certifying projects for an allocation of grants for treatment works construction. The Michigan Water Resources Commission (Commission) is statutorily required to promulgate rules to establish the priority of proposed treatment works projects based upon a system which will satisfy the requirements of FWPCA. M.C.L.A. 323.122(2).[3] In accordance with these rules, the Commission assigns a priority rating to each grant applicant. M.C.L.A. 323.126(3). A "priority list" or "project list" is then submitted by the Commission to the Michigan legislature for approval. M.C.L.A. 323.126(4). Upon approval, the projects appearing on the priority list are certified by the Commission to the administering federal agency (EPA) for potential federal obligation of Title II grants. *Id.* The projects on the certified priority list collectively request an amount equal to or less than the federal monies allotted to Michigan for the fiscal year and

are therefore deemed "fundable". In the event that a fundable project is unlikely to achieve an obligation of allotted federal funds prior to the expiration of the fiscal year, Michigan will "by-pass" that project in favor of the next priority project which can be timely funded through obligation of available grants. This enables Michigan to utilize all of its allotted funds and forecloses reallocation of otherwise unobligated funds to other states at the end of a given fiscal year.

In August, 1981, the City of Detroit filed with the court a "Petition to Re-allocate Unobligated (Unrescinded) Grant Funds and/or for Instruction Re Consent Judgment Mandated Projects." Various hearings were conducted by the district court in September and November, 1981. At that time approximately $35 million allotted grant funds were still available for EPA obligation but, although Detroit's projects were of priority and therefore in the fundable range, it was apparent that Detroit would be unable to timely satisfy the criteria necessary for EPA obligation by the expiration of FY 1981 (September 30, 1982). On March 16, 1982, the district court entered an Order reserving the allotted but unobligated funds for Detroit:

As reflected in this schedule attached hereto as Exhibit D, it is expected that Detroit will not have submitted to MDNR by September 30, 1982, applications for the full amount of the funds available to Detroit. Accordingly, it is expected that the full amount of the funds available to Detroit will not have been obligated by September 30, 1982. Notwithstanding the above, it is the intention of this Order that any portion of the funds available to

---

**2.** This regulation states in full:

(b) Unless otherwise provided by Congress, all sums allotted to a State under Section 205 of the Act shall remain available for obligation until the end of one year after the close of the fiscal year for which the sums were authorized. Except as provided in § 35.2020(a), sums not obligated at the end of that period shall be immediately reallotted on the basis of the same ratio as applicable to sums allotted for the then-current fiscal year, but none of the funds reallotted shall be made

available to any State which failed to obligate any of the fiscal year funds being reallotted. Any sum made available to a State by reallotment under this section shall be in addition to any funds otherwise allotted to such State for grants under this subpart during any fiscal year and the reallotted funds shall be treated in the same manner as the most recent allotment.

**3.** *See:* Michigan Administrative Code, Rules 323.1271 *et seq.*

Detroit not obligated to Detroit by September 30, 1982, remain available to Detroit for the projects contained in Exhibit C (as modified by Exhibit D) and that no portion of such funds shall lapse or be otherwise allocated, re-allocated, obligated or de-obligated by EPA or MDNR without further order of this Court.

On the date of entry of this Order, Congress had not appropriated any funds for FY 1982. This order thus assured availability of monies to Detroit after the expiration of FY 1981 in the event the federal government abandoned or suspended future Title II appropriations. The March 16, 1982 Order served to effectively enjoin Michigan from implementing its by-pass system so as to ensure full utilization of its allotted funds prior to the expiration of FY 1981, and it enjoined the EPA from reallotting Michigan's unobligated funds to other states at the expiration of FY 1981 in violation of the expressed Congressional intent.

On July 19, 1982, PL 97–216, a fiscal 1982 federal supplemental appropriation law, was enacted, from which approximately $97 million was allocated to Michigan. Shortly thereafter, Michigan moved the district court to modify its March 16, 1982 Order asserting that all necessary funding for Detroit projects could be obtained from FY 1982 appropriations. The EPA joined in this motion. The County of Muskegon (Muskegon) intervened to support Michigan's motion. Muskegon urged that two of its proposed projects (Sullivan Discharge and Muskegon Rehabilitation) assumed priority positions in the fundable by-pass range. Muskegon served interrogatories upon the EPA and Michigan the answers to which firmly established that had the Detroit projects been by-passed, Muskegon's two projects would indeed have achieved obligations of FY 1981 Title II funds. Muskegon expressly challenged the district court's authority to "lasso" funds for the sole benefit of Detroit. Detroit opposed Michigan's motion.

On September 16, 1982, 14 days before the expiration of FY 1981, the district court entered an Order denying Michigan's motion to amend the Order of March 16, 1982, stating summarily that "a modification of that Order would adversely affect DWSD". On October 7, 1982, Muskegon filed a notice of appeal with this Court challenging the district court's September 16, 1982 Order. Michigan has adopted Muskegon's appellate Statement of Case and Argument. During the pendency of this appeal, the two Muskegon projects which would have been funded from FY 1981 funds but for the district court's Orders of March 16 and September 16 were subsequently funded from FY 1982 allocations. The City of Detroit has moved this Court to dismiss the instant appeal as moot, and the United States has supported the motion.

■ Confronting the issue of mootness as joined by Detroit, it is initially observed that federal jurisdiction under Article III, Section 2 of the United States Constitution extends only to actual cases and controversies. *Board of School Commissioners of the City of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). It is fundamental that the federal forum is not empowered to decide moot issues. *State of California v. San Pablo & T.R. Co.,* 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747, 748 (1893); *United States v. Alaska S.S. Co.,* 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808 (1920). An "exception" to Article III's requirement of an active case or controversy is a controversy "capable of repetition, yet evading review". *See generally: Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 3040 n. 9, 73 L.Ed.2d 690 (1982); *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). If the plaintiff represents a similarly situated class, then a "controversy" will continue to exist between a defendant and the class even though the claim of the named plaintiff may have become moot. *Sosna, supra.*

In the absence of class certification the "capable of repetition" doctrine is

> limited to the situation where two elements combine [ ]: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.

*Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). *Accord: Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *Lane v. Williams,* 455 U.S. 624, 102 S.Ct. 1322, 1328, 71 L.Ed.2d 508 (1982); *Illinois State Board of Elections v. Socialist-Workers Party,* 440 U.S. 173, 187, 99 S.Ct. 983, 991–92, 59 L.Ed.2d 230 (1979); *Sosna, supra.*

 To the extent that Muskegon challenged the district court's authority to "lasso" funds, assigned as "injury" a lack of funding for two projects in the FY 1981 fundable by-pass range, and sought as a remedy a recision of the district court's Orders reserving Title II funds for Detroit and a corresponding "return" of those monies to Michigan's general allotment pool, this court concludes that the "controversy" is one which is capable of repetition yet evading review. It must be emphasized that Muskegon expressly challenged in the district court that court's authority to "lasso" or reserve unobligated funds for Detroit:

> [T]he reservation of such funds to the City of Detroit and the DWSD is contrary to the statute, PL 92500 [FWPCA], since they have failed to file proper and sufficient applications for grant funds in such amounts. * * * With all due respect to this Court, it simply does not have authority to obligate sewerage grant monies.

Since the district court's Orders constituted unequivocal declarations of its authority to "reserve" Title II funds for Detroit, it is obvious that the court's exercise of authority in future fiscal years is certainly "capable of repetition". To the extent that Muskegon sought a "return" of unobligated FY 1981 Title II funds to Michigan's general allotment pool to provide Title II funds for two projects in the FY 1981 fundable by-pass range, the district court's exercise of authority presented a controversy which "evades review". The lower court's Order of September 16 was entered 14 days prior to the expiration of FY 1981 (September 30, 1982). Muskegon alerted the district court to the possible irreparable injury which would result not only to itself but also to Michigan through potential reallocation of the Title II monies to other states:

> [T]his defendant believes that if the remaining FY 1981 Sewerage Construction Grants are not obligated to Michigan projects by September 30, 1982, such funds will be re-allocated to other states and, thus, lost to Michigan projects, including those pertaining to this defendant.

As aforenoted, the Administrator of the EPA is statutorily mandated to immediately reallot all unobligated funds to other states at the expiration of the fiscal year. 33 U.S.C. § 1285(b)(1); 40 C.F.R. § 35.-2010(b). Muskegon's concern, therefore, that irreparable harm would manifest in 14 days was not specious.[4] It was incumbent upon Muskegon to exhaust its legal remedies including appellate review of its charges that the unwarranted impounding of Title II FY 1981 grants by the Court deprived it of funds for its two projects which were within the FY 1981 fundable by-pass range within 14 days. The time constraints applicable to Muskegon in connection with the exhaustion of legal remedies, including appellate review, were too short even when, as here, review was diligently pursued. *See: Roe, supra* (266 day gestation period); *Southern Pacific Terminal Co., supra* (2 year injunction). Future exercises of authority by the district court would continue to evade judicial review

---

4. This Court expresses no opinion on the legal issue of whether Michigan, or the other states, are now entitled to the FY 1981 funds or whether some other disposition of the funds is appropriate.

since the period of review would under no circumstances exceed one year.

There is also a "reasonable expectation that the same complaining party [Muskegon] would be subjected to the same action [a similar exercise of authority by the district court] again." *See: Weinstein, supra; Murphy, supra; Lane, supra.* Muskegon was an active applicant for Title II funding during FY 1981 and 1982 and is expected to maintain such activity in future fiscal years. Therefore, to the extent that Muskegon challenged the lower court's authority, assigned as "injury" lack of funding, and requested a recision of the court's impounding orders and a return of Title II funds to Michigan's allotment pool, the controversy is one capable of repetition yet evading review and not moot irrespective of Muskegon's receipt of Title II funding from FY 1982 appropriations.[5]

Further, to the extent that Muskegon challenged the district court's authority to reserve FY 1981 Title II funds for Detroit, and charged on appeal as "injury" an alleged future adverse priority positioning for *other* proposed projects on Michigan's FY 1982 priority list, and seeks a declaration that the district court exceeded its authority with its impounding orders, the "controversy" is one which has a continuing adverse impact upon Muskegon and therefore satisfies the "case" and "controversy" criteria of Article III. It is undisputed that several projects on Michigan's FY 1981 priority list, including Muskegon's Sullivan Discharge and Rehabilitation projects, would have been funded from FY 1981 Title II appropriations but for the impounding of the remainder of that year's allotted funds by the district court through its orders of March 16 and September 16, 1982, "reserv-

ing" said funds solely for the benefit of Detroit. Several of those priority projects in the FY 1981 fundable by-pass range carried over and assumed a priority position somewhere on Michigan's FY 1982 priority list.[6] Some of those projects were funded from FY 1982 appropriations thereby depleting the allotments available to other FY 1982 priority projects. This spill-over of fundable FY 1981 projects into FY 1982 served, at a minimum, to alter the positioning and potential funding priority of all projects appearing on the FY 1982 priority list. Particularly, Muskegon not only assumed FY 1982 Priority Nos. 8 and 9 (which projects were funded), but also Priority No. 34 (unfunded). Muskegon was, and continues to be, "injured" by the district court's challenged exercise of authority. The funding of Muskegon's Priority Nos. 8 and 9 from FY 1982 Title II funds does not render this controversy moot.

Addressing the district court's authority to enter the following order,

No portion of such funds shall lapse or be otherwise allocated, re-allocated, obligated or de-obligated by EPA or MDNR without further order of this Court,

it is apparent that the EPA was effectively foreclosed from fulfilling its obligation under 33 U.S.C. § 1285(b)(1) and 40 C.F.R. § 35.2010(b) to immediately reallocate the unobligated funds to the other states at the end of FY 1981. Michigan was effectively precluded from certifying by-pass projects to the EPA to achieve timely obligation of allotted funds and assure that all FY 1981 Title II funds would not be lost by reallocation to other states. Since the district court's Orders of March 16 and September 16, 1982 failed to address, justify or explain

---

**5.** As aforenoted, class certification may also serve to defeat a finding of mootness. *Sosna, supra. See also: United States Parole Commission v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Although Muskegon did not move the district court for class certification, it did refer to the interests of similarly situated entities in its briefs before the district court. On appeal, Muskegon has not documented the existence of a continuing controversy between a "class member" and defendants, to-wit, Muskegon has not estab-

lished the existence of projects in the FY 1981 fundable by-pass range which were not funded from FY 1982 appropriations. This Court, therefore, does not address the issue of mootness within the context of class certification.

**6.** For example, Muskegon's 1981 Sullivan Discharge and Rehabilitation projects became Priority Nos. 8 and 9 on Michigan's 1982 priority list.

the basis of its authority to enter its Orders, we review the justifications urged by Detroit on appeal.

 It is urged by Detroit that the district court's exercise of authority was justified since the EPA initiated this compliance action pursuant to Title III of FWPCA and executed a Consent Judgment with knowledge that compliance would not be possible in the absence of federal contribution under Title II. However, it is fundamental that the compliance and grant provisions of the FWPCA are not mutually dependent. *State Water Control Board v. Train,* 559 F.2d 921 (4th Cir.1977). If the federal forum possessed the authority to mandate EPA contributions under Title II in Title III compliance actions, then the EPA would be pragmatically restricted to seeking compliance only in actions where it would guarantee federal funds to effect the compliance judgments obtained. This was patently not the intent of Congress. *Train, supra.*

Detroit's argument that EPA had consented to a waiver of "procedural" requirements in the implementation of Title II through execution of the consent judgments is equally misplaced. Initially, it is observed that the EPA, at both the district and appellate levels, expressly challenged rather than consented to the lower court's authority to "reserve" Title II appropriations. Michigan issued a similar challenge. Nor will this Court characterize the detailed statutory framework appearing in Title II as a mere "procedural" technicality subject to discretionary waiver by the EPA. It is fundamental that an agency charged with implementation of a statutory framework ordinarily possesses no authority to deviate from or abdicate its statutory responsibilities. It is clear that the EPA did not intend to do so in this case, and it is not appropriate for this Court to imply a waiver of a clear statutory duty.

The spirit of cooperation which has been exhibited by both litigants and the district court is commendable. However, the accomplishment of an objective, even if desirable, cannot be justified at the expense of breaching the constitutional separation

of power between the three branches of our government—this separation must be scrupulously maintained. Accordingly, Detroit's motion to dismiss this action as moot is hereby DENIED. The district court's Orders of March 16, 1982 and September 16, 1982 are hereby VACATED, for lack of authority, to the extent that said Orders precluded the allocation, reallocation, obligation or de-obligation of allotted but unobligated FY 1981 funds by the EPA or MDNR and retained said funds for Detroit. This cause is hereby REMANDED for further proceedings consistent with this opinion.