UNITED STATES of America, Plaintiff and Counter–Defendant,

and

Wayne County Department of Health, Air Pollution Control Division, Plaintiff,

v.

STATE OF MICHIGAN, Defendant, Counter–Plaintiff and Cross–Plaintiff,

v.

CITY OF DETROIT, a municipal corporation, and Detroit Water and Sewerage Department, Defendants and Cross–Defendants,

v.

ALL COMMUNITIES AND AGENCIES UNDER CONTRACT WITH the CITY OF DETROIT FOR SEWAGE TREATMENT SERVICES,

v.

DETROIT AREA LAUNDRY POLLUTION CONTROL GROUP, a voluntary, non-profit, unincorporated association, and its Members,

v.

The FOOD AND ALLIED INDUSTRIES COMMITTEE OF METROPOLITAN DETROIT, a voluntary non-profit, unincorporated association, and its Members, Intervening Rate Challengers.

Civ. A. No. 77–71100.

United States District Court, E.D. Michigan, S.D.

Dec. 23, 1991.

See also 777 F.Supp. 1365.

Kenneth D. Kruse, Pagnucco, Kruse & Tamsen, P.C., Allen Park, Mich., for City of Allen Park.

Pamela G. Shea, Beier, Howlett, Ternan, Devine, Jones, Shea & Hafeli, P.C., Bloomfield Hills, Mich., for Oakland County.

C. Gerald Hemming, Law, Hemming, Essad & Palaczyk, P.C., Plymouth, Mich., for Canton Tp., Northville Tp., Plymouth Tp. and Western Wayne Tp. Utility Authority (WTUA).

Leonard A. Krazyzaniak, Jr., Vandeveer & Garzia, P.C., Detroit, Mich., for City of Dearborn.

Adam J. Dadaou, Inkster, Mich., for City of Dearborn Heights.

Milton Spokojny, Farmington Hills, Mich., for City of Inkster.

Harry C. Tatigian, Livonia, Mich., for City of Livonia.

R.W. Lowe, Lowe & LeWandowski, P.C., Plymouth, Mich., for City of Plymouth.

Owen J. Cummings, Cummings, McClorey, Davis & Acho, P.C., Livonia, Mich., for Redford Tp.

Ronald E. Mack, Berry, Hopson, Francis, Mack & Siefman, P.C., Detroit, Mich., for City of Romulus.

Patrick B. McCauley, Sommers, Schwartz, Silver & Schwartz, P.C., Southfield, Mich., for Van Buren Tp. and Taylor.

Richard S. Clark, Millar, Weinberg, Necker, Johnson, Clark & Ryan, P.C., Wayne, Mich., for City of Wayne.

Charles Brian James, Bokos & Plakas, P.C., Westland, Mich., for City of Westland and Southgate.

Mark Van Putten, Nat. Wildlife Federation, Ann Arbor, Mich.

Daniel Andrews, Cozadd, Shangle, Smith & Stone, P.C., Dearborn, Mich., for Beleveeille.

William J. DeBiasi, Taylor, Mich., for Brownstown.

Edward Zelenak, Lincoln Park, Mich., for Lincoln Park.

Michael H. Feiler, Feiler, Joelson, Lakind & Rosenberg, P.C., Farmington Hills, Mich., for City of River Rouge.

Eugene A. Goreta, Ecorse, Mich., for Ecorse.

Randall Pentiuk, Pentiuk, Miller & Waterman, P.C., Taylor, Mich., for Riverview.

Randy Kalmbach, Look, Kalmbach & Look, P.C., Wyandotte, Mich., for Wyandotte.

Fred R. Disheroon, Sp. Litigation Counsel, U.S. Dept. of Justice, Washington, D.C., Stephen F. Schuesler, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., Sebastian Patti, Office of Regional Counsel, Region V, E.P.A., Chicago, Ill., L. Michael Wicks, Peter Caplan, Asst. U.S. Atty., Chief Civ. Div., Office of the U.S. Atty., Detroit, Mich., and Frank J. Kelley, Atty. Gen., and John C. Scherbarth, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., for the U.S. and State of Mich.

James A. Smith, Bodman, Longley & Dahling, John P. Williams, Butzel, Long, Gust, Klein & Van Zile, Philip G. Tannian, Richard E. Hinks, Fildew, Hinks, Gilbride, Miller & Todd, Detroit, Mich., George Kircos, Ford Motor Co. Word Headquarters, Dearborn, Mich., Robert H. Fredericks, Chief Deputy Drain Com'rs, Oakland Coun-

ty Drain Com'n, Pontiac, Mich., Avery K. Williams, Cooper, Fink & Zausmer, P.C., William P. Hampton, John M. Donohue, Kohl, Secrete, Wardle, Lynch, Clark & Hampton, P.C., Farmington Hills, Mich., William M. Misterovich, Mt. Clemens, Mich., Darryl F. Alexander, Asst. Corp. Counsel, City of Detroit Law Dept., Water & Sewerage Div., Tim Howlett, Dickinson, Wright, Moon, Van Dusen & Freeman, Karl R. Bennett, Jr., Stringari, Fritz, Kreger, Ahearn, Bennett & Hunsinger, P.C., Detroit, Mich., Peter J. Kelley, Kelley & Cramer, P.C., Ann Arbor, Mich., and Antoinette R. Raheem, Joseph M. Polito and Beth Gotthelf, Honigman, Miller, Schwartz & Cohn, P.C., Detroit, Mich., for Communities Severed by DWSD Treatment Plant.

## OPINION AND ORDER

FEIKENS, District Judge.

Before me is the City of Detroit's ("Detroit") and the Detroit Water and Sewerage Department's ("DWSD") petition to restrain and to preliminarily enjoin the transfer of deobligated grant funds to the state revolving loan program. Petitioners have administrative appeals of adverse funding decisions currently pending before the Michigan Department of Natural Resources ("MDNR") and the United States Environmental Protection Agency ("EPA"). Detroit claims that unless EPA and MDNR refrain from transferring deobligated Clean Water Act ("CWA") Title II grant funds to Michigan's State Water Pollution Control Revolving Fund ("SRF"), any success secured during the appeal process will be meaningless as no money will be available to fund approved grant increases.

A hearing was held on September 30, 1991, on Detroit's *ex parte* petition to restrain and to preliminarily enjoin the transfer and loss of deobligated or other grant funds to the state revolving loan program. At the conclusion of that hearing I issued a temporary restraining order ("TRO"). The parties subsequently agreed to extend that order until December 3, 1991, in order to preserve the *status quo* and give the parties an opportunity to respond to the petition. An additional hearing was held on December 3, 1991, with all parties present. After careful consideration of all papers filed in response to this petition and of the arguments raised at that hearing, I GRANT the motion to enjoin the State of Michigan and EPA from transferring any deobligated or other Title II grant funds to Michigan's SRF and I continue the restraining order.

### I. *Statutory Background*

In 1956, Congress enacted the Federal Water Pollution Control Act, Pub.L. No. 84–660. In 1972, the Act was significantly amended by what is commonly known as the Clean Water Act, 33 U.S.C. § 1251 *et seq.* Title II of the CWA established a construction grant program which reimbursed municipalities for a portion of the cost of constructing publicly owned wastewater treatment works. 33 U.S.C. §§ 1281–87. Grant funds were annually appropriated by Congress and allocated to the states according to a formula provided in the CWA. 33 U.S.C. § 1285.

Each state, through an appropriate department—in Michigan, the MDNR—then decided how to distribute its allocation to the various treatment works projects within the state. To that end each state developed its annual priority list, a ranking of the projects that the state anticipated would receive grants, with an eye towards maximizing the usefulness of the limited grant money. 33 U.S.C. § 1296, 40 CFR §§ 35.915(c) and 35.2015(c).

Grant funds were obligated to specific projects only after the state certified that the project was entitled to priority. The municipality then submitted an application to EPA, including plans, specifications and estimates, and EPA determined whether the project met the criteria for grant awards. 33 U.S.C. §§ 1281(a), 1283, 1284.

Occasionally, qualified projects experienced cost overruns. In that event the Title II program would fund the increase if it was necessary and justifiable. The state agency and EPA would review proposed project changes and, if approved, would pay the increase from unused funds.

In 1987 Congress again amended the CWA, phasing out the Title II *grant* program and replacing it with a *loan* program under Title VI. 33 U.S.C. §§ 1381–87. However, Congress appropriated funds for the Title II program through fiscal year ("FY") 1990. Those FY 1990 funds were available to states for grant awards in FY 1990 and 1991. Although no new Title II funds are authorized, states may have funds available that have been deobligated from previous grants (primarily because of cost underruns) or reallotted from states that did not obligate their full allotment. 33 U.S.C. § 1285(d).

Under Title VI, federal funds are now disbursed through a given state's SRF, which can issue low or no-interest loans (as opposed to grants) to qualifying projects. States are also permitted to transfer unobligated Title II funds to their newly created SRFs. 33 U.S.C. § 1285(m). Funds which were neither obligated nor transferred by September 30, 1991, were to revert to EPA for distribution to other states. However, in a recently issued "class deviation," the EPA waived the normal process of reallotment of unobligated grant funds and permitted states to retain such funds so as to "allow them to use these funds to manage their [grant-funded] projects to successful completion." 56 Fed.Reg. 47403–47404, September 19, 1991.

## II. *Factual Background*

The facts in this case are largely undisputed. Pursuant to the Consent Judgment and the Amended Consent Judgment entered in this case, Detroit has constructed several sewage treatment works projects. During the course of construction of these projects, numerous change orders were issued that increased the cost of each project. Detroit, in timely fashion, has sought Title II grant increases to cover these additional costs. Those requests have been granted in part and denied in part. Detroit's administrative appeals of the adverse funding decisions were also timely filed, and are currently pending.

It is also undisputed that Michigan has at its disposal approximately $4.5 million in funds deobligated from other Title II projects. However, Michigan wishes to transfer these funds into its SRF account, rather than leave the money in the expiring Title II program for the enlargement of grants. Michigan concedes that if it leaves the funds in the expiring Title II program, monies would be available for the type of grant amendments currently sought by Detroit—assuming, of course, that Detroit is successful on its appeals. Michigan also concedes that if the funds are transferred to the SRF there is no mechanism whereby funds could be transferred from the SRF back into the Title II program.

## III. *Jurisdiction*

■ The State and EPA both argue that this court lacks jurisdiction over the claims raised in Detroit's petition. This concern must be addressed before turning to the merits of Detroit's petition [1].

### A. Conflict with Congress' Appropriations Power

EPA contends, citing *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), and *United States v. Detroit*, 720 F.2d 443 (6th Cir.1983), that Congress has exclusive power to decide whether and how to fund CWA grants, a power with which courts may not interfere. However, EPA misperceives the issue, for Congress' appropriations power is simply not implicated in this dispute. This conflict arises out of MDNR's desire to transfer *already-appropriated* grant funds during the pendency of Detroit's timely appeal of grant increase denials. The funds at issue are currently available for obligation as reissued grant funds if they remain in the Title II program.

---

1. Jurisdiction was found to exist in a nearly identical case recently decided in Pennsylvania. *City of Lancaster Sewer Authority v. Davis, et al.*, No. 1:CV–91–1284 (M.D.Pa., filed November 25, 1991). In fact, EPA was represented in that case by the same counsel as now appears before me, and EPA filed substantially similar briefs in both actions. At issue in the Pennsylvania case were *un*obligated Title II grant funds (as opposed to *de*obligated grant funds) that were about to be transferred to Pennsylvania's SRF. For purposes of this analysis, that is a distinction without a difference.

In *OPM*, the Supreme Court held that the lower court could not apply equitable principles to award money from the Treasury when Congress had explicitly indicated to the contrary. The situation with which I am presented is easily distinguishable. Detroit does not seek the award of Treasury funds. The injunction has no effect on Congress' appropriations power since the injunction does not order the payment of anything to anyone.

EPA's reliance on *Detroit* is equally misplaced. There, the United States Court of Appeals for the Sixth Circuit held that I had no jurisdiction to enjoin EPA from disposing allocated but unobligated funds and to order those funds set aside for the use of the City of Detroit. In that case Detroit's projects were high on Michigan's priority list but did not satisfy EPA criteria for funding before the expiration of the fiscal year. No application for funds was pending, and other grantees were ready to proceed. The court of appeals held that the injunction I entered violated the "constitutional separation of power between the three branches of our government ... [which] must be scrupulously maintained." *Detroit*, 720 F.2d at 451.

The court relied heavily on the fact that the injunction blocked EPA from fulfilling a statutory duty, because my order:

> effectively foreclosed [the EPA] from fulfilling its obligation under 33 U.S.C. § 1285(b)(1) and 40 C.F.R. § 35.2010(b)(1) to immediately reallocate the unobligated funds to the other states at the end of FY 1981. Michigan was effectively precluded from certifying bypass projects to the EPA to achieve timely obligation of allotted funds and assure that all FY 1981 Title II funds would not be lost by reallocation to other states.

*Detroit*, 720 F.2d at 450.

In this case there is no statutory duty to transfer these funds. A state *may* transfer Title II grant funds to its SRF, but it is not *required* to do so. In fact, EPA has recently issued guidance in the form of a class deviation encouraging states to maintain a separate pool of grant funds through 1995 to meet legitimate funding needs, such as those pressed by Detroit. 56 Fed. Reg. 47403–47404, Sept. 19, 1991. The deviation seems clairvoyantly to address the exact situation before me: "Deobligations are important because they will be the only source within each state for funding grant increases."

Other important differences exist between the circumstances in *Detroit* and those before me now. In *Detroit*, the City was simply not eligible for funding because it had failed to meet appropriate EPA criteria. In the current case, not only is Detroit eligible, the grant increases it seeks are for cost overruns on already-funded projects.

Importantly, my previous injunction in *Detroit* prevented other qualified communities in Michigan from receiving grant funding (since a large amount of funds was set aside solely for Detroit). In this case I am not setting aside funds for any community. I am merely ensuring that funds are available should Detroit prevail on its administrative appeals. There is no evidence that other communities will be unable to obtain SRF loans unless or until these disputed funds are deposited into that account. I note that no other communities petitioned to restrain MDNR and EPA from transferring these funds, nor have any communities sought to intervene in this case. Thus, there is no indication that I am impermissibly placing Detroit at the top of the priority list by granting this injunction, as Michigan and EPA contend. Accordingly, issues of "fairness" to other communities are not implicated in this decision as they were in the *Detroit* decision.

### B. Applicability of the "Lapse" Cases

■ The "lapse" cases are a line of cases developed in the United States Court of Appeals for the D.C. Circuit in which courts have used their equitable powers to avoid the lapse of budgetary authority due to the passing of a statutorily imposed deadline while a plaintiff's application for funds was pending.

#### 1. *Lapse vs. Reallocation*

In the *Lancaster* case, Judge Rambo decided that a strikingly similar dispute was

comparable to the "lapse" cases and that equitable jurisdiction was therefore appropriate. *Lancaster*, No. 1:CV–91–1284 (M.D.Pa., filed November 25, 1991) at 9. I agree. Here, as there, "[P]laintiff does not seek adjudication of the merits of its appeals before the EPA but instead requests the court to invoke its inherent equitable powers to maintain the status quo pending resolution of those appeals so that plaintiff will have something more than a pyrrhic victory should it prevail." *Id.*

In *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 55–56 (D.C.Cir.1977), the United States Court of Appeals for the D.C. Circuit held that the district court had committed reversible error when it denied Jacksonville's application for a TRO which sought to prevent the lapse of unobligated Federal Aviation Administration ("FAA") funds. Jacksonville timely applied for grant funding shortly before the close of the fiscal year, the FAA's cut-off date for funding decisions, but was forced to file suit for equitable relief to prevent the funds from reverting to the Treasury prior to the disposition of its administrative claim on the merits. The court stated:

> It was an abuse of discretion to have denied an order holding the matter in status quo, where ... Jacksonville was in danger of losing the money by lapse of the FAA's authority; and preliminary relief would hold open the grant without actual payment, subject to later modification.

*Jacksonville*, 556 F.2d at 54. The court recognized that an agency should not be permitted to dispose of unused funds when a timely request for them had been made, particularly when the request had not been ruled upon through no fault of the applicant.

Subsequent cases make it clear that this anti-lapse doctrine is still viable. *See West Virginia Ass'n of Community Health Centers v. Heckler*, 734 F.2d 1570, 1576–77

(D.C.Cir.1984) ("[A]n equitable doctrine has been fashioned by the federal courts in recent years to permit funds to be awarded to a deserving plaintiff even after the statutory lapse date, as long as the lawsuit was initiated on or before that date."); *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C.Cir.1982), *cert. denied, Schweiker v. State of Conn.*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983) ("This court has repeatedly reaffirmed the power of courts to order that funds be held available beyond their statutory lapse date if equity requires."); *National Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C.Cir.1977) ("Decisions that a court may act to prevent the expiration of a budget authority which has not terminated at the time suit is filed are completely consistent with the accepted principle that the equity powers of the court allow them to take action to preserve the status quo of a dispute...."); *Rochester Pure Waters District v. EPA*, 724 F.Supp. 1038, 1045–46 (D.C.Cir.1989).

EPA and Michigan, however, contend that this dispute does not qualify as a lapse case and that I am therefore unable to grant equitable relief. They point out that the funds at issue would not technically lapse—that is, revert to the Treasury—but will be transferred to the SRF. Detroit can hardly take solace in that since the practical effect is the same: no funds will be available should Detroit prevail on its appeals.

The *Rochester* case is instructive here.[2] The district court there granted interlocutory and permanent injunctive relief to a grantee who sought to reserve grant funds threatened by *rescission*[3]. The court, following the lapse cases, held that whether the grant funds were scheduled to lapse, or, as in that case, were to be rescinded, the effect on the grantee was the same, *i.e.*, the administrative process would be rendered meaningless and the ability to obtain funds would be lost: "[S]hould the

---

2. EPA, as it did in the *Lancaster* decision, invites the court to ignore the *Rochester* decision as wrongly decided and the subject of a pending appeal. I decline to do so, and to the extent applicable, rely on *Rochester*'s reasoning.

3. Rescission is the process whereby Congress revokes an agency's authority to allocate funds as opposed to including a statutory time limit within the budget allocation.

disputed funds be rescinded prior to a final agency decision, any future victory that plaintiffs secure at the administrative level would be a hollow one." *Rochester*, 724 F.Supp. at 1043. Accordingly, the court exercised its equitable powers and suspended the rescission of the funds pending the final resolution of plaintiffs' underlying claims.

I agree that the EPA's narrow reading of the lapse cases is unpersuasive. The *Lancaster* court stated:

> Congress has expressed an intent for unobligated funds to go somewhere—in *Jacksonville* and *Rochester Pure Waters* Congress directed that the funds go back to the treasury; here, the funds were slated to be funnelled into [the] SRF. While this is not a "lapse" in the technical sense, the effect of the transfers on the applicants is the same—they will receive nothing once the transfer is made.

*Lancaster* at 13.

### 2. *Timeliness*

A factor consistently stressed in *Rochester* and the other lapse cases is that the petitioner must file suit prior to the actual lapse of funds. There is no dispute as to that factor here; indeed, the funds at issue are still available due to the temporary restraining order I issued.

### 3. *Entitlement*

■ Michigan and the EPA make several other arguments regarding lack of jurisdiction over this dispute, only one of which deserves further attention.[4] The EPA alleges that Detroit's suit hinges on portraying the case as one involving an "entitlement" to grant funding. The EPA argues that Congress has authorized a new "contender" for unobligated or deobligated grant funds—the state SRF—and has given this entity "higher rights" to the remaining grant funds than has Detroit. This statement is simply disingenuous.

EPA cites no authority for this proposition; the section of the CWA that allows states to transfer grant funds to the SRF does not support it (33 U.S.C. § 1285(m)); and as pointed out earlier, EPA itself has encouraged states to use such funds to successfully complete Title II grant projects.

Moreover, Detroit has made it clear that it is not asking this court to determine the merits of its requests pending before MDNR and EPA. It is simply asking this court to exercise its equitable powers to preserve the *status quo* so that a meaningful administrative review process can continue, *i.e.*, one with funds available at its conclusion. Therefore, Michigan's and EPA's arguments are misplaced.

For the foregoing reasons, I find that Detroit is entitled to a full, fair and meaningful review of its appeals for additional funding. Detroit has followed the EPA-prescribed appeal process set forth in 40 CFR § 35.3030, which provides that "[t]he state agency *will* make a final decision," and that "[a] state's failure to address the disputed action or omission in a timely fashion, or in writing, will not preclude [EPA] Regional review." 40 CFR § 35.-3030(a) (emphasis added). While the EPA contends that the state, by electing to move funds from the grant program to the SRF, is merely determining the priority to be given Detroit's appeals in an "indirect way," it fails to mention that this apparent "indirect" decision is precisely the reason Detroit has sought judicial action. This informal and indirect decision violates Detroit's right to complete a full and fair administrative appeals process. *See, e.g., Southern Mutual Help Ass'n v. Califano*, 574 F.2d 518 (D.C.Cir.1977); *Massachusetts Fair Share v. LEAA*, 758 F.2d 708 (D.C.Cir.1985); *Kansas City, Mo. v. HUD*, 861 F.2d 739 (D.C.Cir.1988).

As the court in *Lancaster* stated:

---

**4.** Although not discussed in the body of the opinion, I believe jurisdiction is also proper because this claim arises pursuant to Title II of the CWA, 33 U.S.C. §§ 1281 *et seq.*, presenting a federal question under 28 U.S.C. § 1331(a). Jurisdiction is also proper in that the claim

involves the ability of Detroit to comply with the terms of the Amended Consent Judgment entered in this case, over which I have retained jurisdiction and to which this claim can be considered ancillary.

The court finds that the basic sense of unfairness present here, where plaintiff dutifully pursues all administrative avenues available only to have the rug pulled out by inaction, is sufficient for the court to invoke its equitable jurisdiction and hear this matter.

*Lancaster* at 17.

### IV. *Preliminary Injunction*

A. Standard of Review

■ The United States Court of Appeals for the Sixth Circuit states the traditional four-part test for preliminary injunctions in *Tyson Foods v. McReynolds*, 865 F.2d 99, 101 (6th Cir.1989):

> [T]his Circuit has set forth four standards which must be considered: 1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; 2) whether the plaintiffs have shown irreparable injury; 3) whether the issuance of a preliminary injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing a preliminary injunction [citations omitted].

I find Detroit has met this test.

1. *Will Detroit be irreparably harmed?*

As stated earlier, I find Detroit is entitled to a full, fair and meaningful appeal process. That process is meaningless if, at its conclusion, all available grant funds have been transferred to the SRF. The injury is irreparable because no mechanism exists whereby Detroit can recover funds if it is ultimately successful on its appeals.

2. *Would the issuance of a preliminary injunction cause substantial harm to others?*

Given the recent EPA guidance encouraging states to maintain deobligated grant funds in a separate pool to meet potential future grant increases, it is difficult to see how the EPA or the state could be harmed by my ordering essentially that. If Detroit is unsuccessful on these appeals, the funds at issue can always be transferred to the SRF at that time.

3. *Is the public interest served by issuing the preliminary injunction?*

The public interest lies in the orderly management and completion of grant-funded projects. EPA has declared as much in its class deviation. This court has declared it such in the Amended Consent Judgment entered in this case. Moreover, the public interest is served by assuring a full, fair and meaningful administrative appeals process within the MDNR and EPA.

EPA argues that sequestering these funds is not in the public interest because Detroit is likely to lose its appeals on the merits. Even if this were so, sequestering these funds for the period it takes Detroit to complete its appeal process is hardly a disservice to the public interest.

EPA and Michigan also assert that the injunction would harm the interests of other municipalities that are interested in obtaining *grant* funding. As noted previously, no other community initiated a similar action or sought to intervene in this case. Therefore, whether or not I issue this injunction, no other community is entitled to additional grant funds. Moreover, there is no evidence that Michigan's SRF is undercapitalized, thereby depriving other communities of *loan* funds they might otherwise be able to acquire had these funds been transferred.

4. *Is Detroit likely to succeed on the merits?*

EPA simply asserts that Detroit "has no prospect of relief on the merits." I do not understand how the EPA can make this argument unless it has already determined the merits of Detroit's appeals in violation of its own procedures. The EPA has not made any final determinations on Detroit's appeals, nor should it at this juncture. It would be equally inappropriate if, as EPA suggested, MDNR has already informally or "indirectly" determined the merits of Detroit's requests as well (by deciding to transfer all grant funds to the SRF).

The state argues that Detroit has failed to make the requisite showing. However,

Detroit is intimately familiar with EPA's extensive procedures for determining grant eligibility and it contends that the work for which funding is sought fully complies with all legitimate agency and state requirements. It is telling, I think, that Michigan never suggests that the costs for which Detroit seeks funding are "non-allowable." Detroit asserts the reason for this is that these costs are allowable, and MDNR withheld funding solely because it lacked the time to properly review these requests. Michigan offers no evidence to refute this assertion.

Like the plaintiffs in *Rochester*, the petitioners here:

> have not slept on their rights. They have pursued their appeals through the multi-leveled review process at both the state and federal level pursuant to EPA regulation. They should not be penalized for EPA's inefficient and lengthy appeals process. Had EPA resolved this matter expeditiously, plaintiffs would not find themselves in their present position.

*Rochester*, 724 F.Supp. at 1045.

For the foregoing reasons, Detroit has met the four-part test articulated in *Tyson*. Accordingly, IT IS ORDERED that petitioners' Motion To Restrain and Preliminarily Enjoin the Transfer and Loss of Deobligated or Other Grant Funds to the State Revolving Loan Program is hereby GRANTED. The MDNR and EPA are enjoined from transferring any Title II grant funds to Michigan's SRF until Detroit's administrative appeals of adverse funding decisions, instituted on or before September 30, 1991, receive final agency action.

IT IS SO ORDERED.